556 A.2d 1343

COMMONWEALTH of Pennsylvania, Appellant [at 162],

v.

Louis SLATON, Appellant [at 229].

Superior Court of Pennsylvania.

Submitted June 3, 1988.

Filed March 31, 1989.

302

Robert L. Eberhardt, Deputy District Attorney, Pittsburgh, for Com. (at 162) and appellee (at 229).

Charles E. Foerster, Pittsburgh, for appellee (at 162) and appellant (at 229).

Before CIRILLO, President Judge, and CAVANAUGH, ROWLEY, WIEAND, McEWEN, BECK, KELLY, POPOVICH and MELINSON, JJ.

MELINSON, Judge:

This is an appeal filed by the Commonwealth from an Order of the Court of Common Pleas of Allegheny County granting, in part, Appellee's omnibus pre-trial motion to suppress evidence. Appellee (hereinafter "Slaton") has cross-appealed the portion of the Order denying the suppression of other evidence. We affirm the portion of the trial court's Order granting Slaton's motion to suppress. Slaton's cross-appeal is quashed as interlocutory.

On November 21, 1983, Agent Eugene C. Beard, Jr., of the Bureau of Narcotics of the Commonwealth of Pennsylvania, visited Lou's Pharmacy in East Pittsburgh, Pennsylvania. The purpose of Beard's visit was to search the "Schedule II file"[1] of the pharmacy in the course of an investigation into the activities of an individual referred to as "Merriweather." This individual allegedly had been forging prescriptions in the general vicinity of Lou's. Beard notified the pharmacist, Slaton, that he wished to look through his Schedule II file for information on Merriweather. Slaton responded by showing Beard the file.

During the course of searching the file for evidence against Merriweather, Beard found many other forged prescriptions, apparently unrelated to the Merriweather case. He removed these prescriptions from the Schedule II file

---

1. A "Schedule II" file refers to records kept pursuant to Pa.Stat.Ann. tit. 35, Section 780–112 (Purdon 1977), which provides, in pertinent part:

> (b) Every practitioner licensed by law to administer, dispense or distribute controlled substances shall keep a record of all such substances administered, dispensed or distributed by him, showing the amount administered, dispensed or distributed, the date, the name and address of the patient, and in the case of a veterinarian, the name and address of the owners of the animal to whom such substances are dispensed or distributed.

This is labelled a "Schedule II" file because the records kept in this file represent the dispensation of any substance listed in Pa.Stat.Ann. tit. 35, Section 780–104(2) (Purdon 1987 Supp.), titled "Schedule II."

and, in accordance with Bureau of Narcotics policy, left receipts for the removed prescriptions in the file. Within the next few days, Beard contacted the doctors who, according to the confiscated slips, were purported to have written the prescriptions. He learned that the prescriptions were, indeed, forgeries.

On December 6, 1983, Beard, with another narcotics agent, returned to Lou's Pharmacy and, again, notified Slaton that he wished to continue searching his Schedule II file. Beard did not state that he was looking for more information on Merriweather, but neither did he state that he was no longer looking for information on that individual. Read in its totality the record shows that Slaton, on the occasions of the latter two visits, was under the impression that the agents were searching for more information on Merriweather. Under those circumstances, Slaton again permitted Beard to search the file. Additional suspected forged prescriptions were removed by the agents on that date and on the following day, December 7, 1983.

Slaton was arrested on January 16, 1985, and was charged with sixty-one (61) counts of Violation of the Controlled Substance, Drug, Device, and Cosmetic Act: Distribution by Practitioner in Bad Faith. Pa.Stat.Ann. tit. 35, Section 780–113(a)(14) (Purdon 1987 Supp.). Slaton filed an omnibus pre-trial motion, requesting, *inter alia,* that the prescription slips taken from the Schedule II file be suppressed on the grounds that his consent was improperly obtained.

The trial court denied the motion with regard to the prescription slips seized on Agent Beard's first visit to Lou's Pharmacy. The court found, however, that by December 6, 1983, Slaton had become "the focus of the investigation and that, accordingly, a warrant to search was constitutionally required." The trial court further found that the Commonwealth had not proved that Slaton knowingly and intelligently consented to a search of the premises. Thus, in the absence of a valid search warrant, the prescription slips seized on December 6 and 7 of 1983 were

illegally seized and, therefore, were inadmissible as evidence against Slaton.[2] The Commonwealth has appealed this Order of the trial court. Slaton has cross-appealed, claiming that the prescription slips seized at the time of Beard's first visit should also have been suppressed as the result of an illegal search.

I.

### Appeal of the Commonwealth

### No. 162 Pittsburgh, 1986

We shall first address the issues raised by the Commonwealth. Initially, the Commonwealth alleges that the trial court incorrectly concluded that Slaton was the focus of the investigation on December 6 and 7. Alternatively, it is asserted that, even if Slaton had been the focus of the investigation on those dates, he voluntarily consented to the search of the Schedule II file.

"[T]he Commonwealth's appeal of a suppression order is proper as an appeal from a final order when the Commonwealth certifies in good faith that the suppression order terminates or substantially handicaps its prosecution." *Commonwealth v. Dugger*, 506 Pa. 537, 546–47, 486 A.2d 382, 386 (1985). The Commonwealth certified on the record in the trial court, and in the brief submitted on appeal, that the Order suppressing twenty-six (26) of the sixty-one (61) prescription slips "substantially handicaps its ability to prosecute all the instant charges based upon all available evidence."[3] Thus, we shall address the merits of this appeal.

2. The trial court's ruling resulted in the suppression of twenty-six (26) prescription slips. Thus, the Commonwealth was able to proceed to trial with thirty-five (35) of the original sixty-one (61) forged prescriptions as evidence against Slaton.

3. While we are obliged to follow the law as stated in *Dugger*, we are puzzled by the Commonwealth's position in this case. We understand that the suppression order substantially handicaps the Commonwealth's ability to prosecute the charges relating to the twenty-six (26) suppressed prescription slips; however, there remain *thirty-five* (35) charges on which the Commonwealth may proceed. Given the facts

The trial court found that by the dates of the latter two searches (December 6th and 7th), Slaton had become the focus of the investigation. The record supports that factual finding. However, that finding is not dispositive of the constitutionality of the searches. The issue to be decided is whether Slaton's consent to the warrantless searches of December 6th and 7th was voluntary under Pennsylvania law.

Initially, we note that Pa.Stat.Ann. tit. 35, Section 780–134 (Purdon 1977) governs the issues in this case. That section provides, in pertinent part:

> (b)(1) For the purpose of inspecting, copying, and verifying the correctness of records, reports, or other documents required to be kept or made under this act and otherwise facilitating the carrying out of his functions under this act, the secretary is authorized, in accordance with this section, to enter controlled premises and to conduct administrative inspections thereof, and of the things specified in this section, relevant to those functions.

> (2) Such entries and inspections shall be carried out through officers or employes (hereinafter referred to as "officers") designated by the secretary. *Any such officer upon stating his purpose and presenting to the owner, operator, or officer in charge of such premises (i) appropriate credentials and (ii) a written notice of his inspection authority* ... shall have the right to enter such premises and conduct such inspection at reasonable times....

> (c) A warrant under this section shall not be required for the inspection of books and records pursuant to any administrative subpoena issued in accordance with any provisions of any Act of Assembly nor for entries and administrative inspections (including seizures of property):

of this case, we fail to see, as a practical matter, how the Commonwealth's ability to prosecute is substantially handicapped.

(1) *With the consent of the owner, operator, or officer in charge of the controlled premises;*

(2) In situations presenting imminent danger to health or safety;

(3) In situations involving inspection of conveyances where there is reasonable cause to believe that the mobility of the conveyance makes it impracticable to obtain a warrant;

(4) In any other exceptional or emergency circumstance where time or opportunity to apply for a warrant is lacking; or

(5) In any other situations where a warrant is not constitutionally required.

Pa.Stat.Ann. tit. 35, Section 780–124 (Purdon 1977) (emphasis added).

We are aware that there is federal case law which holds that statutes authorizing warrantless searches, in some instances, may be reasonable and necessary to further federal interests. Such statutes are not violative of the Fourth Amendment. U.S. Const. amend. IV; *see United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (federally licensed firearms dealer is engaged in highly regulated industry; thus, is subject to warrantless searches under statutory scheme); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (holder of federal retail liquor dealer's occupational tax stamp must pay fine for refusal to allow agents to conduct warrantless search under federal statute).

We are, however, not dealing with such a statute in this case. The statute with which we are concerned authorizes a search with, *inter alia,* the consent of the owner/operator, with a warrant, or in any situation where a warrant is not constitutionally required. Pa.Stat.Ann. tit. 35, Section 780–124 (Purdon 1977). Although the pharmaceutical field is a highly regulated industry, the Pennsylvania legislature has not seen fit to authorize warrantless searches. The statute in question only authorizes warrantless

searches in specific instances, one of those being with the consent of the owner/operator. The statute further provides that the agent seeking to conduct such an inspection must identify himself and state his *purpose*. Finally, the statute provides a detailed procedure for obtaining a warrant, and a "probable cause" standard for the issuance of same. Pa.Stat.Ann. tit. 35, Section 780–124 (Purdon 1977). We find that the legislature has not authorized warrantless searches of pharmacies. Moreover, we find that, in this instance, absent any of the statutorily enumerated exceptions, such as consent, a search warrant was required.

The mere fact that Slaton permitted a search is not, however, determinative of the issue. The Supreme Court of this Commonwealth has held that "a mere acquiescence to a claim of lawful authority does not discharge the burden that consent must be freely and voluntarily given." *Commonwealth v. Maxwell*, 505 Pa. 152, 162, 477 A.2d 1309, 1314, *cert. denied* 469 U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984), *citing Commonwealth v. Davenport*, 453 Pa. 235, 308 A.2d 85 (1973), *later app. aff'd.* 462 Pa. 543, 342 A.2d 67 (1975). Thus, the answer to the suppression question raised in this appeal hinges on whether Slaton's consent to the searches was voluntary. The trial court found that Slaton's consent was not voluntary. There is ample support for this finding; hence, it should not be disturbed.

■ Our scope of review in a suppression case is a narrow one. The Pennsylvania Supreme Court has recently spoken on this issue.

In reviewing the ruling of a suppression court, the reviewing court's initial task is to determine whether the factual findings are supported by the record.

*Commonwealth v. Monarch*, 510 Pa. 138, 147, 507 A.2d 74, 78 (1986), *citing Commonwealth v. Johnson*, 467 Pa. 146, 354 A.2d 886 (1976). The Supreme Court has further stated:

[W]here the Commonwealth is appealing the adverse decision of a suppression court, a reviewing court must consider only the evidence of the defendant's witnesses

and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted.

*Commonwealth v. James,* 506 Pa. 526, 532–33, 486 A.2d 376, 379 (1985), *quoting Commonwealth v. Hamlin,* 503 Pa. 210, 216, 469 A.2d 137, 139 (1983).

The Commonwealth claims that the trial court erred when it found that Slaton was the focus of the investigation. Although the trial court incorrectly resolved the suppression issue on the basis of "focus," we believe that the court's supporting factual findings are relevant to our conclusion that the agent's actions vitiated any consent. The trial court noted that "... Defendant was the focus of the investigation and that, accordingly, a warrant to search was constitutionally required." [4] The learned trial judge based this conclusion on his finding that the testimony of the only witness to testify at the suppression hearing, Commonwealth Narcotics Agent Eugene C. Beard, was not credible. There is ample evidence in the record to support this finding. It is well-settled in this Commonwealth that credibility findings are within the sole province of the trial court and will not be disturbed on appeal. *See Commonwealth v. Garcia,* 370 Pa.Super. 132, 535 A.2d 1186 (1988).

The most telling part of Agent Beard's testimony was the following:

At this time [after November 21, 1983] this agent [Beard] realized that the pharmacist, Louis Slaton, should have realized that the prescriptions were bad or at least had made an attempt to verify the prescriptions.

(N.T., November 27, 1985, p. 44.) Agent Beard also testified that:

4. We base our holding in this case on Pa.Stat.Ann. tit. 35, Section 780–124 (Purdon 1977) and that statute's requirement that a search be conducted either with the consent of the owner/operator or with a search warrant, not on the trial court's conclusion that a warrant was needed because Slaton was "the focus" of the investigation. *See Gerace v. Holmes Protection of Philadelphia,* 357 Pa.Super. 467, 516 A.2d 354 (1986) (appellate court may affirm upon a rationale different from the one set forth in the opinion of the trial court).

> [I]t is generally common practice on Schedule II drugs that most pharmacists will call to verify a Schedule II drug, especially Percoset, Percodan, drugs like that. Number two, there were a lot of scratch outs. I mean, the copies looked like obvious copies from a mimeograph machine or a Xerox machine. Things had been written over, traced, even on the prescriptions themselves.

(N.T., November 27, 1985, p. 46.) He further stated that during the course of his first two visits to the pharmacy, he asked Slaton if he had called the "prescribing doctors" to verify any of the prescriptions in question. Slaton responded that he had not done so. (N.T., November 27, 1985, p. 45.)

Despite Agent Beard's protestations to the contrary, the above-quoted testimony was certainly a sufficient basis for the trial court to find that Slaton had become the focus of the investigation after the November 21, 1983, visit. Beard's testimony that Slaton was not a suspect was belied by his (Beard's) testimony that the prescriptions were obvious forgeries and that he had learned, from the "prescribing doctors," that they were forgeries.

 If Slaton was suspected of wrongdoing, but was laboring under the misapprehension that his files were being searched for evidence against a person by the name of Merriweather, his consent was not voluntary. Consent to a search undertaken under false pretenses [5] is not truly voluntary. *Commonwealth v. Poteete*, 274 Pa.Super. 490,

---

5. We have not here distinguished between active misrepresentations and omissions of certain information and/or facts by the police. For purposes of interpreting the statute in question in this case, we find that deliberate misrepresentations or falsifications or omissions of pertinent information have the same result. The statute specifically requires an agent seeking to inspect files to state his identity and his purpose for the search. Because consent turns on the state of mind of the person who is consenting, *Commonwealth v. Poteete*, 274 Pa.Super. 490, 418 A.2d 513 (1980), and because of the specificity of Pa.Stat.Ann. tit. 35, Section 780–124 (Purdon 1977), we find that any misrepresentation regarding the purpose of a warrantless statutory search, whether by omission or commission, vitiates consent.

418 A.2d 513 (1980).[6] Slaton could not voluntarily consent to something of which he was unaware, namely, a search of his Schedule II file for evidence against him.

In this case, as in *Poteete*, Slaton was misled by an officer of the law, who had identified himself and announced an official purpose for his visits. The officer did not disclose the full purpose of his visits and withheld information indicating that Slaton was suspected of criminal conduct. Whether or not Agent Beard intended to mislead Slaton is irrelevant. Consent turns on the state of mind of the citizen, not that of the officer. *Commonwealth v. Poteete*, 274 Pa.Super. at 498, 418 A.2d at 517. Although zeal in the performance of one's duties as an officer of the law is generally commendable, such zeal should never be used to excuse a violation of an individual's statutorily protected civil liberties. As that preeminent judicial scholar, Mr.

6. We are aware of the panel opinion of this court written by the Honorable John T.J. Kelly, Jr., our distinguished colleague, in *Commonwealth v. Carelli*, 377 Pa.Super. 117, 546 A.2d 1185 (1988). We find the case before us is distinguishable on its facts from *Carelli*. The Pennsylvania Legislature has required that, prior to the inspection of pharmacy records, the officer seeking to conduct such inspection shall state his purpose and present appropriate credentials. Pa.Stat. Ann. tit. 35, Section 780-124(b)(2) (Purdon 1977). Agent Beard did not state the full purpose of his inspection, as required by statute. Further, the case law cited in *Carelli* as support for the dilution of the voluntary consent requirement outlined in *Commonwealth v. Poteete*, 274 Pa.Super. 490, 418 A.2d 513 (1980), deals with police misrepresentations inherently different from those found in the case at bar. The cases cited by the majority in *Carelli* were primarily cases dealing with undercover agents in fact situations uniquely suited to such police tactics; e.g., illegal narcotics dealings and illegal gambling operations. Another situation discussed in *Carelli* was where a third party, such as a spouse or other co-habitant, consented to a search of the defendant's premises. The holdings of those cases are inapposite to the case at bar where the inspecting agent is *statutorily required* to state the purpose of his search prior to conducting such inspection.

This discussion, however, is not to be interpreted as adopting the holding of the majority opinion in *Carelli*, at least with respect to the type of statutory search involved in this case. As the Honorable John G. Brosky, our learned colleague, succinctly notes in his dissent in *Carelli, Commonwealth v. Wright*, 411 Pa. 81, 190 A.2d 709 (1963), the basis upon which *Poteete* was decided, has never been overruled by our Supreme Court. It is not the function of an intermediate appellate court to overrule the Supreme Court of this Commonwealth. *See Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985).

Justice Brandeis, counseled in his dissenting opinion in *Olmstead v. United States*, 277 U.S. 438, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944, 957 (1928):

> ... [I]t is also immaterial that the intrusion was in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning, but without understanding.

We, therefore, find that there was no informed, voluntary consent to the warrantless searches conducted on December 6 and 7, 1983. We affirm the Order of the trial court which suppressed the evidence seized on those days.

## II.

### Appeal of Louis Slaton

### No. 229 Pittsburgh, 1986

We now address Slaton's cross-appeal. We find that there is a threshold issue raised by this cross-appeal. That issue is whether this court has the jurisdiction to hear a criminal defendant's cross-appeal from the denial of a portion of a pretrial suppression motion when the Commonwealth has filed an appeal from the granting of another portion of that same motion. We hold that this court does not have such jurisdiction because such a cross-appeal is interlocutory. Hence, Slaton's cross-appeal is quashed.

We have determined that this court has no jurisdiction to hear a cross-appeal by a criminal defendant from an order denying a motion to suppress. Jurisdiction, generally, is defined as follows:

> The word is a term of large and comprehensive import, and embraces every kind of judicial action. It is the authority by which courts and judicial officers take cognizance of and decide cases. The legal right by which judges exercise their authority. It exists when court has

cognizance of class of cases involved, proper parties are present, and point to be decided is within powers of court. Power and authority of a court to hear and determine a judicial proceeding. The right and power of a court to adjudicate concerning the subject matter in a given case.

Black's Law Dictionary 766 (5th ed. 1979) (citations omitted). Subject matter jurisdiction, specifically, is defined as:

Power of a particular court to hear the type of case that is then before it. Term refers to jurisdiction of court over class of cases to which particular case belongs, ...; jurisdiction over the nature of the cause of action and relief sought, ...; or the amount for which a court of limited jurisdiction is authorized to enter judgment.

*A court is without authority to adjudicate a matter over which it has no jurisdiction* even though the court possesses jurisdiction over the parties to the litigation;....

Black's Law Dictionary 767 (5th ed. 1979) (emphasis added) (citations omitted).

One of the most venerable and learned of our American jurists wrote extensively on the subject of jurisdiction. We can cite no more authoritative source than Chief Justice Marshall of the United States Supreme Court, who, over one hundred and eighty years ago, discussed the power of a court to hear cases that are brought before it. The words he wrote then should guide us today in our consideration of this significant issue:

Courts which originate in the common law possess a jurisdiction which must be regulated by the common law, until some statute shall change their established principles; but courts *which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction* ....

This opinion is not to be considered as abridging the power of courts over their own officers, or to protect themselves, and their members, from being disturbed in the exercise of their functions. It extends only to the

power of taking cognizance of any question between individuals, or between the government and individuals.

*To enable the court to decide on such question, the power to determine it must be given by written law.*

*Ex parte Bollman and Ex parte Swartwout,* 8 U.S. (4 Cranch) 75, 2 L.Ed. 554 (1807) (emphasis added).

This court is a court "created by written law." Pa. Const. art. 5, Sections 1, 3. "Exclusive appellate jurisdiction of all appeals from *final orders* of the courts of common pleas...." has been conferred upon this court by the legislative branch of the government of the Commonwealth of Pennsylvania. 42 Pa.Cons.Stat.Ann. Section 742 (Purdon 1981) (emphasis added). The Pennsylvania legislature has further provided that lack of subject matter jurisdiction cannot be waived. 42 Pa.Cons.Stat.Ann. Section 704(b) (Purdon 1981).[7] "An order is a 'final order', so as to be appealable, if it ends the litigation or disposes of the entire case." *Commonwealth v. Wise,* 328 Pa.Super. 491, 477 A.2d 552 (1984), *citing Esh v. Awglis,* 291 Pa.Super. 528, 436 A.2d 242 (1981).

■ In *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963), the Supreme Court of Pennsylvania noted that, where a motion to suppress has been granted, "the element of finality inherent in the order of the suppression is apparent and sufficient to render the order appealable," for the purpose of an appeal by the Commonwealth. *Commonwealth v. Bosurgi,* 411 Pa. at 63, 190 A.2d at 308. Where a motion to suppress has been denied, however, there is no element of finality present. *Commonwealth v. Bosurgi,* 411 Pa. at 64, 190 A.2d at 309. We find that the denial of a motion to suppress is not a final order within the meaning of 42 Pa.Cons.Stat.Ann. Section 742 (Purdon 1981). There is no magic wand that this court can wave to transform an

7. 42 Pa.Cons.Stat.Ann. Section 704(b) (Purdon 1981) provides that appellate jurisdiction is not perfected by an appellee's failure to object to jurisdiction where the appeal taken is an attempt to appeal from an interlocutory order.

interlocutory order into a final order thereby creating subject matter jurisdiction in this court.

The issue of cross-appeals by criminal defendants where the Commonwealth has appealed part of the trial court's disposition of a motion to suppress was addressed by the Supreme Court of Pennsylvania in *Commonwealth v. Fisher*, 422 Pa. 134, 221 A.2d 115 (1966). In *Fisher*, the defendant gave three statements to the police. One of the statements was made during the preliminary stages of the investigation. As a result of that initial statement, the defendant was interrogated on two subsequent occasions and gave two additional inculpatory statements. The trial court suppressed the latter two statements but held the first statement to be admissible. The Commonwealth appealed and the defendant cross-appealed. The defendant's cross-appeal was quashed. The Supreme Court held:

> The defendant in a criminal case may not appeal from a pretrial order denying his motion for the suppression of evidence: *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963).

*Commonwealth v. Fisher*, 422 Pa. at 136, 221 A.2d at 116. In *Bosurgi*, cited in *Fisher* above, the Supreme Court stated:

> The right of appeal by a defendant stands upon an entirely different footing. The denial of a defendant's motion for the suppression of evidence does not deprive a defendant of an appellate review of the validity of that order. At trial, the defendant still has full opportunity to object to the introduction into evidence of the allegedly improper evidence and, in the event of his conviction, he will then have an opportunity to secure an appellate evaluation of the propriety and admissibility of such evidence. Therefore, unlike the Commonwealth, an adverse pretrial disposition of a motion to suppress evidence does not deprive the defendant of his only opportunity for appellate review. Under such circumstances, *the element of finality, which is the basis of appealability, is*

*lacking in an order denying suppression and the defendant should have no right of appeal from such order.* Commonwealth v. Bosurgi, 411 Pa. at 64, 190 A.2d at 308–309 (emphasis added).

Two years after *Fisher*, the Supreme Court decided *Commonwealth v. Bordner*, 432 Pa. 405, 247 A.2d 612 (1968). In *Bordner*, the defendant made six incriminating statements to the police without the benefit of warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court suppressed five of the six statements, holding that upon making the initial inculpatory statement (Statement Number 1), the defendant had become the focus of the police investigation and, thus, *Miranda* warnings should have been given prior to any questioning by the police. The Commonwealth appealed to the Supreme Court.

The Supreme Court in *Bordner*, with four Justices joining, discussed the trial court's holding with regard to Statement Number 1, the non-suppressed statement:

Bordner was first interrogated on November 22nd and the early afternoon of November 23rd. The evidence indicates that during these interrogations the police were engaged in a general fact-finding process in that they were still questioning other members of Bordner's family. Thus, Bordner was not entitled to any warning of his constitutional rights by the police at this stage and under these circumstances: *Escobedo v. Illinois*, 378 U.S. 478, 491, 84 S.Ct. 1758 [12 L.Ed.2d 977] (1964). Bordner suddenly admitted on November 23rd that he had done it (the crime) and asked what would happen to him. This statement, made in the presence of a policeman and the county coroner, is captioned Statement No. 1 and, as found by the court below, is admissible into evidence even though he had not been given all the United States Supreme Court-mandated warnings as to his rights since the focus of the investigation had not yet settled upon Bordner as the accused at the time of the making of that

statement. Cf. *Escobedo,* supra [378 U.S.] p. 491 [84 S.Ct. at 1765].

*Commonwealth v. Bordner,* 432 Pa. at 411–12, 247 A.2d at 615–16.

It should be noted that there was *no cross-appeal by the defendant in Bordner.* Thus, in the course of deciding an appeal by the Commonwealth of a suppression issue, the Court commented on the admissibility of evidence found to be admissible by the trial court *even though that issue had not been appealed by either party.* The Court, in passing on the admissibility of Statement Number 1, did not, however, cite to *Fisher* or *Bosurgi.*

We cannot assume, however, that the Supreme Court overlooked either *Fisher* or *Bosurgi* when *Bordner* was decided. Justice (later Chief Justice) Roberts, who concurred in the result in a separate opinion, wrote:

> Since neither party can properly raise the issue of the admissibility of Statement No. 1, it is clear that this Court cannot decide that issue. Since the issue is not properly before the Court in this case, I must conclude that the Court's discussion of the issue is merely unfortunate dictum. As a result, I find it unnecessary to posture this opinion as a dissent, although I am obligated to condemn the pursuit in dictum of an important issue not properly cognizable by the Court.

*Commonwealth v. Bordner,* 432 Pa. at 422, 247 A.2d at 621 (Roberts, J., concurring). Justice Roberts, citing *Bosurgi,* noted that such an appeal by a defendant is interlocutory and, therefore, not in the proper posture for appellate review.

In *Commonwealth v. Barnes,* 307 Pa.Super. 143, 452 A.2d 1355 (1982), this court cited the *Bordner* case as authority for considering the cross-appeal of the defendant/appellee. The learned three-judge panel that decided *Barnes,* relying on judicial economy and consistency of treatment as rationale for its holding, found that *"Bordner's* effect is to permit a criminal defendant to cross-appeal a denied suppression motion when the Commonwealth

appeals a granted suppression motion." *Commonwealth v. Barnes*, 307 Pa.Super. at 146, 452 A.2d at 1356. That opinion states:

> The opinion of the court in *Bordner*, with four Justices joining, *reached the merits of the defendant's* as well as the Commonwealth's appeal from pre-trial suppression rulings. The majority opinion did not make any reference to the fact that its consideration of *defendant's appeal* on the merits was a departure from the rule in *Fisher*.

*Commonwealth v. Barnes*, 307 Pa.Super. at 146–47, 452 A.2d at 1356 (emphasis added). Our reading of *Bordner* shows, however, that there was *no appeal, cross or otherwise*, by the defendant/appellee in that case. We do not consider the majority's silence in *Bordner* to be sufficient reason to overrule a line of cases dating back to 1963, particularly where the question was not properly before the Court. Further, the Supreme Court has warned this court against misinterpreting procedures previously established by that Court. In *Commonwealth v. Dugger*, Justice McDermott, writing for the Court, cautioned us that, "There is a grave and profound difference between our direction to the Superior Court to hear an appeal, and our reasons for disposing of an appeal in a specific case." *Commonwealth v. Dugger*, 506 Pa. 537, 543–44, 486 A.2d 382, 385 (1985) (footnote omitted).

*Commonwealth v. Dugger* was a companion case to *Commonwealth v. Lapia*, 311 Pa.Super. 264, 457 A.2d 877 (1983) [8] when *Dugger* was initially decided by the Superior Court. The Superior Court opinion in that case held that *Commonwealth v. Hill*, 497 Pa. 230, 439 A.2d 1153 (1982), *sub silentio*, overruled the holding of *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963). In *Hill*, the Supreme Court declined to entertain an appeal by the Commonwealth, stating, "... we do not believe the order sup-

---

**8.** *Commonwealth v. Lapia* and *Commonwealth v. Dugger* were combined for disposition by the Superior Court at 311 Pa.Super. 264, 457 A.2d 877 (1983). We will refer to this case as *Commonwealth v. Dugger* because, ultimately, it is the Supreme Court's reasoning in *Dugger* with which we are concerned in this portion of our opinion.

pressing the weapon substantially impairs the Common-
wealth's case." *Commonwealth v. Hill*, 497 Pa. at 230, 439
A.2d at 1153. In analyzing the Supreme Court's decision in
*Hill*, the Superior Court in *Dugger* found that the Supreme
Court overruled its own directive to the Superior Court in
*Commonwealth v. Bosurgi* to hear appeals by the Com-
monwealth where it is certified that an order by a suppres-
sion court substantially handicaps the prosecution of the
case. The Commonwealth appealed the Superior Court's
decision in *Dugger* to the Supreme Court.[9] The Supreme
Court reversed the Superior Court's decision and reminded
this court of its duty to follow the directives of the Supreme
Court.

We find that the situation currently before us presents a
similar dilemma. We have a direct holding by the Supreme
Court that a criminal defendant may not appeal a pretrial
determination by a suppression court. *Commonwealth v.
Fisher*, 422 Pa. 134, 221 A.2d 115 (1966); *see also Common-
wealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963). Later,
in *Commonwealth v. Bordner*, 432 Pa. 405, 247 A.2d 612
(1968), in the course of deciding an appeal by the Common-
wealth of a suppression issue, our Supreme Court com-
mented on the admissibility of evidence found to be admissi-
ble by the trial court, even though that issue had not been
appealed by either party. While this may appear to be a
departure from previous rulings, we believe that if the
Supreme Court had intended to overrule *Fisher* and *Bosur-
gi*, it would have done so explicitly. As an intermediate
appellate court, it is the duty of this court to follow the law
as established by the Supreme Court, not to disregard such
law without an express directive from that Court. *See
Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382
(1985); *Commonwealth v. Hill*, 497 Pa. 230, 439 A.2d 1153
(1982).

**9.** In *Dugger* the Superior Court affirmed the trial court's suppression
order. It was actually from this holding that the Commonwealth
appealed. The Supreme Court reversed the Superior Court's finding
on the suppression issue and also addressed and reversed the Superior
Court's independent determination of the propriety of the Common-
wealth's appeal.

Further, we do not find compelling the reasons relied upon by this court in *Barnes* for allowing cross-appeals by defendants when the Commonwealth has appealed from a suppression Order. The court cited judicial economy and consistency of treatment as advantages to be gained by hearing both appeals, stating:

The same basic fact situations will often be present in both appeals and there is an undeniable saving of time and expense for both parties and the court if the issues are not artificially separated.

There is an additional advantage of consistency of treatment to be had in permitting such cross-appeals. Results grounded in contradictory interpretations of the same facts might be obtained if one panel of this court treated the interlocutory appeal of the Commonwealth and another panel handled the post-conviction appeal of the defendant.

*Commonwealth v. Barnes*, 307 Pa.Super. at 146, 452 A.2d at 1357. However, if the same basic fact situations were present in these appeals, then, following the reasoning of *Barnes*, presumably the results of the suppression hearing would have been the same on all issues. In fact, it is precisely because the fact situations are *different* that part of a suppression motion would be denied while another part of the same motion would be granted.

For example, in the case at bar, clearly the trial court found that the fact situations were different. This finding explains the different results reached on separate facets of the motion to suppress. The court found that Agent Beard had information in his possession on the dates of the latter two searches which was different from that which he had on the date of his initial visit. Thus, as a result of this different information, something different was required of him, that is, he was required to notify Slaton of the information in his possession or, in the alternative, to obtain a search warrant.

Further, were we to rule that a cross-appeal will be allowed where the same basic fact situations are present,

this court would then become embroiled in the potentially arduous task of determining the threshold issue of whether the fact situations presented are indeed the same. Only then could it address the merits of the suppression issues on appeal. Thus, judicial economy and consistency of treatment would not necessarily be served by such a holding. In any event, even if we were to find that judicial economy and consistency of treatment would be served by allowing these cross-appeals, *we find that we are powerless to hear them because this court does not have jurisdiction.* The mere fact that a non-appealable order rides on the coattails of an appealable order does not confer jurisdiction on this court to review the non-appealable order.

In light of the long-standing rule of American jurisprudence that, except in extraordinary circumstances, an appeal may be taken only from a final order of the court, and in recognition of our responsibility to preserve the sanctity of the appellate process, we hold that a criminal defendant may not appeal from an order of a suppression court even in the posture of a cross-appeal.

Hence, Slaton's cross-appeal is quashed as interlocutory. That portion of the trial court's Order granting Slaton's motion to suppress is affirmed. Jurisdiction is relinquished.

KELLY, J., filed a concurring and dissenting opinion.

WIEAND and BECK, JJ., filed a concurring and dissenting statement.

POPOVICH, J., did not participate in the consideration or decision of this case.

KELLY, Judge, concurring and dissenting:

I join in that part of the majority opinion which quashes Louis Slaton's cross-appeal from the trial court's disposition of Slaton's suppression motion. I dissent from that portion of the majority opinion which denies the Commonwealth's appeal from the portion of the trial court's order which directed the suppression of fraudulent prescriptions seized from Slaton's Pharmacy on December 6, 1983 and Decem-

ber 7, 1983. Because of the potential impact of this case on future narcotics law enforcement efforts in this Commonwealth, I set forth the reasons for my dissent at length.

The principle issue in this case is whether Slaton validly consented to warrantless administrative inspections of his pharmacy prescription file on December 6, 1983 and December 7, 1983. The trial court found that Slaton's consent was invalid because his consent could not be deemed to have been granted knowingly, intelligently, and voluntarily when the narcotics agents requesting consent failed to inform Slaton that he was then the focus of a criminal investigation. (Trial Ct.Op. at 2–3). The majority differs slightly from the trial court in sustaining the suppression order. The majority finds that Slaton's consent was invalid because the agents failed to disclose their purpose as statutorily required, and because the agents permitted Slaton to labor under the misapprehension that his prescription file was being inspected for evidence against a person named Merriweather and his accomplices. Majority opinion, *supra*, 383 Pa.Super. at 307–312, 556 A.2d at 1346–1348. Judge Wieand, on the other hand, finds that Slaton's consent was completely voluntary. I agree with Judge Wieand for the following reasons.

## I. STANDARD OF REVIEW

In reviewing a decision of a trial court on a suppression motion, we are bound by findings of fact which have support in the record, but not by the trial court's conclusions of law. *See Commonwealth v. White*, 358 Pa.Super. 120, 123, 516 A.2d 1211, 1212 (1986). In determining whether a finding is supported by the record, we must consider all evidence which supports the finding, from whatever source, and only so much evidence as negates the finding, which viewed in the context of the suppression hearing record as a whole, stands uncontradicted. *Commonwealth v. Carelli*, 377 Pa.Super. 117, 129 n. 1, 546 A.2d 1185, 1191 n. 1 (1988). We must also give due consideration to the trial court's

prerogative as fact finder to access credibility and to choose to believe all, part, or none of the evidence presented. *Id.*[1]

## II. ADMINISTRATIVE INSPECTIONS

Fourth Amendment proscriptions against unreasonable searches and seizures apply only when the conduct challenged violates an actual expectation of privacy which society is prepared to accept as reasonable. *California v. Greenwood,* 486 U.S. 35, ——, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30, 36 (1988) (collecting cases). Though the Fourth Amendment protects people rather than places, the determination of whether an actual and reasonable expectation of privacy exists usually requires some reference to place. *United States v. Katz,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967); *id.,* 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 587 (Harlan, J., concurring).

While the degree of privacy recognized as reasonable with respect to commercial properties is different, and indeed lesser than that recognized with respect to private residences, commercial facilities nonetheless enjoy certain protections under the Fourth Amendment. *See New York v. Burger,* 482 U.S. 691, 699, 107 S.Ct. 2636, 2642, 96 L.Ed.2d 601, 612 (1987); *Dow Chemical Co. v. United States,* 476 U.S. 227, 234, 106 S.Ct. 1819, 1824, 90 L.Ed.2d 226, 235 (1986). Warrantless administrative searches of areas of commercial properties closed to the public are generally deemed unreasonable. *See Michigan v. Clifford,* 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984); *Torres v. Puerto Rico,* 442 U.S. 465, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979); *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56

---

1. If instead we considered only the evidence of the *appellee* and so much of the *Commonwealth* as remained uncontradicted, reversal would be mandated regardless of how implausible the testimony of the Commonwealth's sole witness might have been. The appellee in this case presented no evidence at all at the suppression hearing. Plainly, the source of evidence presented at a suppression hearing cannot control if the trial court's prerogative of accessing credibility and the Commonwealth's burden of proof are to be given full effect. *See Commonwealth v. Carelli, supra,* 377 Pa.Superior Ct. at 129 n. 1, 546 A.2d at 1191 n. 1.

L.Ed.2d 486 (1978); *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

Search warrants based upon probable cause, however, are not always required for inspections of commercial properties. Rather, special administrative inspection warrants may constitutionally be granted based upon a determination that the inspection to be authorized is in furtherance of a general administrative plan to enforce legitimate health and safety regulations. *See Michigan v. Clifford, supra; Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Michigan v. Tyler, supra; Marshall v. Barlow's Inc., supra; Camara v. Municipal Court, supra.* The Supreme Court has also held that in certain pervasively regulated industries limited warrantless administrative inspections may be permitted. *See New York v. Burger, supra* (junkyards engaged in dismantling automobiles); *Donavan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (subsurface mining operations); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms dealers); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (alcohol); *see also Commonwealth v. Lutz,* 512 Pa. 192, 516 A.2d 339 (1986), *remanded on other grounds* 480 U.S. 927, 107 S.Ct. 1560, 94 L.Ed.2d 754 (1987), *vacated on remand* 517 Pa. 481, 538 A.2d 872 (1988) (solid waste); *Peterson v. Pennsylvania State Horse Rac. Com'n,* 68 Pa.Cmwlth. 353, 449 A.2d 774 (1982) (horse racing); *Lanchester v. Pennsylvania State Horse Rac. Com'n,* 16 Pa.Cmwlth. 85, 325 A.2d 648 (1974) (same).

If the scope or duration of an otherwise lawful administrative inspection exceeds the limits appropriate to its legitimate administrative purposes, the inspection becomes a search, and must be justified by a traditional search warrant or equivalent justification. *See Michigan v. Tyler, supra.* However, because legitimate administrative

schemes may have the same ultimate purposes as penal laws, an otherwise lawful administrative inspection properly limited in scope and duration to that appropriate to fulfill the legitimate administrative purposes is not rendered invalid by the inspecting officers' intent to use information and/or evidence obtained during the inspection in a subsequent criminal prosecution. *See New York v. Burger, supra,* 482 U.S. at 711–18, 107 S.Ct. at 2648–52, 96 L.Ed.2d at 620–23. Thus, evidence obtained in a lawful administrative inspection of a pharmacy may be used in a subsequent prosecution for criminal violations of drug laws. *See Commonwealth v. Maras,* 16 Pa.D. & C.3d 700, 706–07 (1979); *see also United States v. Nechy,* 827 F.2d 1161, 1165–66 (7th Cir.1987) (applying *New York v. Burger*); *United States v. Brown,* 763 F.2d 984, 988 (8th Cir.1985); *United States v. Acklen,* 690 F.2d 70, 73–75 (6th Cir.1982); *Matter of Searches and Seizures,* 665 F.2d 775, 776–77 (7th Cir. 1981); *United States v. Jamieson–McKames Pharmaceuticals, Inc.,* 651 F.2d 532, 542 (8th Cir.1981); *United States v. Prendergast,* 585 F.2d 69, 70–71 (3rd Cir.1978); *United States v. Goldfine,* 538 F.2d 815, 818–19 (9th Cir.1976); *State v. Rednor,* 203 N.J.Super. 503, 507, 497 A.2d 544, 547 (1985).

## III. WARRANTLESS ADMINISTRATIVE INSPECTIONS

The only issue properly raised by the Commonwealth in this appeal is whether valid consent was obtained to inspect Slaton's prescription files. Nonetheless, I feel compelled to respond briefly to the majority's gratuitous observation that, "[a]lthough the pharmaceutical field is a highly regulated industry, the Pennsylvania legislature has not seen fit to authorize warrantless searches." Majority Opinion, *supra,* 383 Pa.Superior Ct. at 307, 556 A.2d at 1346.

I find that it is far from clear that such inspections have not been authorized. The relevant statute provides in pertinent part:

**35 P.S. § 780–124. Administrative Inspections and Warrants.**

\* \* \* \* \* \*

(b)(1) For the purpose of inspecting, copying, and verifying the correctness of records, reports, or other documents required to be kept or made under this act and otherwise facilitating the carrying out of his functions under this act, the secretary is authorized, in accordance with this section, to enter controlled premises and to conduct administrative inspections thereof, and of the things specified in this section, relevant to those functions.

(2) Such entries and inspections shall be carried out through officers or employes (thereinafter referred to as 'officers') designated by the secretary. Any such officer upon stating his purpose and presenting to the owner, operator, or officer in charge of such premises (i) appropriate credentials and (ii) a written notice of his inspection authority (which notice in the case of an inspection requiring, or in fact supported by, an administrative inspection warrant shall consist of such warrant), shall have the right to enter such premises and conduct such inspection at reasonable times.

(3) Except as may otherwise be indicated in an applicable inspection warrant, the officer shall have the right: (i) to inspect and copy records, reports, and other documents required to be kept or made under this act; (ii) to inspect, within reasonable limits and in a reasonable manner, controlled premises and all pertinent equipment, finished and unfinished drugs and other substances or materials, containers, and labeling found therein, and, except as provided in this subsection, all other things therein (including records, files, papers, processes, controls, and facilities) appropriate for verification of the records, reports, and documents referred to in subclause (i) or otherwise bearing on the provisions of this act; and (iii) to

inventory any stock of any controlled substance therein and obtain samples of any such substance or article.

\* \* \* \* \* \*

(c) *A warrant under this section shall not be required for* the inspection of books and records pursuant to an administrative subpoena issued in accordance with any provisions of any Act of Assembly nor for *entries and administrative inspections (including seizures of property):*

\* \* \* \* \* \*

(5) *In any other situations where a warrant is not constitutionally required.*

(Emphasis added). Though I do not feel justified in passing on the question of whether the above provisions succeed in constitutionally authorizing warrantless pharmacy inspections, I note that an *at least plausible* argument could be made that § 780–124(c)(5) was intended to authorize such inspections, and that the provisions of § 780–124(b)(1–3) were intended to provide the necessary statutory schema for such inspections under the rationale of *New York v. Burger, Donavan v. Dewey, United States v. Biswell,* and *Colonnade Catering Corp. v. United States.* Indeed, it might well be argued that the statutory authorization in § 780–124(b & c) is *more explicit* than that gleaned from the statutes analyzed in *Lutz, Peterson,* and *Lanchester.*[2]

2. I note, additionally, that courts of other jurisdictions which have considered this question have *uniformly* concluded that legislatures may constitutionally authorize warrantless administrative inspections of pharmacies provided the authorization adequately restricts the scope and manner of such inspections. *See Greenblatt v. New Jersey Bd. of Pharmacy,* 214 N.J.Super. 269, 518 A.2d 1116 (1986); *State v. Rednor,* 203 N.J.Super. 503, 497 A.2d 544 (1985); *Cushing v. Dept. of Prof. Reg.,* 416 So.2d 1197 (Fla.App.1982); *Mendez v. Arizona St. Bd. of Pharmacy,* 129 Ariz. 89, 628 P.2d 972 (1981); *Hosto v. Brickell,* 577 S.W.2d 401 (Ark.1979); *see generally* Annotation, *Propriety of State or Local Government Health Officer's Warrantless Search—Post–Camara Cases,* 53 ALR 4th 1168, 1187–91 (1987 & 1988 Supp.); Annotation, *State and Local Administrative Inspection of and Administrative Warrants to Search Pharmacies,* 29 ALR 4th 264, 268–72 (1984 & 1988 Supp.).

We are, however, simply not called upon to address that issue in this case as it has been neither raised nor briefed by the Commonwealth here or in the trial court, and therefore must be deemed to have been waived.

## IV. WARRANTLESS INSPECTIONS OF REQUIRED RECORDS

Also not presented by this appeal is the question of whether a pharmacist has any legitimate expectation of privacy under the Fourth Amendment or Pa. Const. Art. I, sec. 8 as to the content of the prescription file which he is required by law to maintain.

Unquestionably, prescription files contain extremely private and potentially embarrassing information about the pharmacist's clients. For this reason, pharmacists are charged with a duty to exercise great care to preserve the legitimate privacy expectations of their clients regarding the information contained in the prescription file. *See generally* Turkington, *Legal Protection for the Confidentiality of Health Care Information in Pennsylvania,* 32 Vill.L. Rev. 259, 336–37 (1987); Fox, "Medical and Prescription Records—Patient Access and Confidentiality," *in* Strauss, *The Pharmacist and the Law,* at 38–42 (1980).

It does not follow, however, that *as custodian* of prescription records Slaton acquired vicariously a legitimate expectation of privacy in the records which may be asserted by Slaton against officers authorized by law to inspect such prescription records. *See United States v. Acklen, supra,* 690 F.2d at 74–75; *United States v. Jamieson–McKames Pharmaceuticals, Inc., supra,* 651 F.2d at 541–42. Rather, warrantless inspections of prescription files by appropriate law enforcement personnel may be authorized under the "required records" doctrine. *See Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); *State Real Estate Com'n v. Roberts,* 441 Pa. 159, 271 A.2d 246 (1970), *cert. denied* 402 U.S. 905, 91 S.Ct. 1367, 28 L.Ed.2d 645 (1971); *Reiter v. Commonwealth Ins. Dept.,* 105 Pa. Cmwlth. 623, 629, 525 A.2d 446, 450 (1987) *alloc. denied* 517

Pa. 590, 534 A.2d 770 (1987). This justification for warrant-less inspections stands on grounds separate and distinct from those discussed above for warrantless administrative inspections of pharmacies generally. *Cf. Reiter v. Commonwealth, Dept. of Ins., supra* (finding no statutory authorization for warrantless administrative inspections of insurance offices generally, while noting that the inspection would have been valid if it had been limited in scope to required records).

This issue, too, was waived by the Commonwealth's failure to raise and argue it in the suppression court.

## V. VALIDITY OF SLATON'S CONSENT

We are left then with the only issue properly presented by this appeal, *i.e.* whether Slaton's consent to the inspections of his prescription files was valid. The majority posits two reasons for concluding that Slaton's consent was invalid. First, the majority finds that the narcotics officers failed to state their "purpose" as required by 35 P.S. § 780–124(b)(2). The majority construes the statement of the "purpose" to require disclosure of the fact that Slaton had become the focus of the officers' suspicions by the time of the challenged inspections. Second, the majority finds that in accordance with *Commonwealth v. Poteete, supra,* the officers' "deception" in that respect rendered Slaton's consent invalid. I cannot agree.

## A. STATEMENT OF PURPOSE

Pursuant to 35 P.S. § 780–124(b)(2), the narcotics officers were required to state their purpose, identify themselves and present evidence of their authority to inspect before conducting their administrative inspections. Slaton contends, and the majority agree, that the officers failed to properly state their "purpose" when they failed to inform him that he had become the focus of their investigation. I would find, however, that the mandate of the statute was completely fulfilled by the officers' statements that they

wanted to inspect Slaton's prescription file for fraudulent prescriptions.

The purposes for which administrative inspections may be conducted are set forth in 35 P.S. § 780–124(b)(1) as follows:

For the *purpose* of inspecting, copying, and verifying the correctness of records, reports, or other documents required to be kept or made under this act and otherwise facilitating the carrying out of his functions of this act, the secretary is authorized, in accordance with this section, to enter controlled premises and to conduct administrative inspections thereof, and of the things specified in this section, relevant to those functions.

(Emphasis added). Pursuant to 35 P.S. § 780–124(b)(2), officers authorized by the secretary are required to identify themselves, state their purpose, and provide written notice of inspection upon seeking to conduct an administrative inspection. Read together with § 780–124(b)(1), it is apparent that the requirement in § 780–124(b)(2), that the purpose of the inspection be stated, related to the type of inspection to be conducted and not the motivation or grounds for suspicion which gave rise to the decision to inspect.

State and federal authorities are authorized to conduct administrative inspections which range in scope and duration from a simple inspection of the pharmacy's prescription file to a prolonged audit and review of every facet of the pharmacy's operation. In order to inform the pharmacist of the type and scope of the administrative inspection to be conducted, both state and federal law uniformly require the officers conducting the inspection to state their purpose (*i.e.* the type of inspection to be conducted) before commencing the inspection. The reason for this requirement has been cogently explained as follows:

2. **Entry: Statement of purpose, presentation of credentials and Notice of Inspection.** Federal regulations require that upon seeking to gain entrance into a place which manufactures, holds or distributes controlled substances, a DEA investigator must state the purpose of his

visit, must present his/her credentials, and must provide the operator of the establishment with a Notice of Inspection. The statement of purpose is an important piece of information to obtain. If the DEA investigators announce that the purpose of the visit is a general inspection, the operator of the establishment to be inspected can plan on the investigators being at the establishment for a period of 3–6 weeks. If, on the other hand the DEA investigators announce that their visit is for the simple purpose of checking the firm's biennial inventory report, the establishment operator can calculate that the investigators will probably be at the plant for a short period of time. This statement of purpose will enable the operator to plan his personnel's time accordingly.

Davids, *DEA Administrative Inspections*, 31 Food Drug Cosmetic Law Journal 229, 234 (1981).

I find that Slaton was properly apprised of the "purpose" of the inspection as required by statute, when the officers informed him that they wanted to inspect his prescription file to determine if forged or otherwise fraudulent prescriptions had been presented. Thus, while Slaton was not informed of the officer's underlying motivations, he was fully informed of the type and limited scope of the administrative inspection intended and was thereby prepared for the inconvenience which such an inspection might entail. I do not construe the statute to require any further statement of the motivation or grounds for the decision to inspect. Hence, I dissent from the majority's conclusion that the officers failed to comply with the statute.

## B. CONSENT

The majority contends that the inspection cannot be deemed consensual under 35 P.S. § 780–124(c)(1) because the officers permitted Slaton to remain under the misapprehension that the officers were still looking for evidence against Merriweather and his associates, when the focus of the investigation had shifted by then to Slaton. The majori-

ty find that the officers' "deception" in this respect vitiated any consent obtained from Slaton. I cannot agree.

1.

Early cases involving consent to search contained language which suggested that consent must be knowing and intelligent, *i.e.* made with full and express knowledge of the right to refuse consent. *See Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). However, in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), our Supreme Court held that valid consent is established by demonstrating that it was given voluntarily, *i.e.* without coercion express or implied. Subsequent decisions have reinforced the ruling in *Schneckloth* that the prosecution need not establish that the party giving consent knew that consent could be refused. *See United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

Early cases were also construed to provide that consent obtained by stealth, deceit, or misrepresentation was invalid. *See Commonwealth v. Wright*, 411 Pa. 81, 190 A.2d 709 (1963), *citing Amos v. United States*, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921), *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921),[3] *and Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The *Wright dictum* was followed by this Court in the more recent cases of *Commonwealth v. Poteete*, 274 Pa.Super. 490, 418 A.2d 513 (1980) and *Commonwealth v. Morgan*, 353 Pa.Super. 463, 510 A.2d 754 (1986) (citing *Poteete* ). The majority herein would also rely on the *Wright dictum* as stated in *Poteete*. Their reliance is misplaced.

Subsequent to *Amos, Gould,* and *Weeks,* the United States Supreme Court has repeatedly upheld consensual searches as valid despite deception as to the identity and/or

---

**3.** *Disapproved on other grounds Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

the purpose of the person conducting the "search." *See United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (plurality); *Osborn v. United States*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Rathburn v. United States*, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); *On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). Thus, the United States Supreme Court has expressly recognized that deception does not invariably vitiate consent.

Likewise, more recent cases of our Supreme Court demonstrate that the broad *Wright dictum* (that consent acquired by deception is invalid) does not accurately state the law of consent as it is currently understood in Pennsylvania. In *Commonwealth v. Morgan*, 517 Pa. 93, 534 A.2d 1054 (1987), our Supreme Court reversed the decision of a divided panel of this Court which had held that a suspect's consent for a police officer to enter (by stating "come on in") was rendered invalid by the officer's deception as to his identity (by answering "Joe" to the suspect's question "who's there"). In *Commonwealth v. Albrecht*, 510 Pa. 603, 511 A.2d 764 (1986), *cert. denied* 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987), our Supreme Court held that a suspect's consent to search the trunk of his car was valid despite the fact that the uniformed officers did not inform the suspect that they knew from prior lawful observations that incriminating evidence was located in the trunk. Finally, in *Commonwealth v. Brown*, 437 Pa. 1, 261 A.2d 879 (1970), our Supreme Court held that a uniformed police officer's deception as to the reason for wanting the suspect's gun did not render the suspect's consensual relinquishment of the gun invalid. In *Brown*, after citing *Wright* and acknowledging subsequent federal Supreme Court cases eroding the basis for the broad *dictum* set forth in *Wright*, our Supreme Court concluded:

It is not necessary for this Court to determine what deceptive devices are improper in light of *Lewis*, *Hoffa* and *Lopez* although that is a very difficult question as the United States Supreme Court seems to have granted broad powers to the police. *The Supreme Court, 1966 Term*, 81 Harv.L.Rev. 112, 191–4 (1967). It is enough to state that in light of those three United States Supreme Court decisions, the police officer's (Petrovich) tactics were constitutional, and the court below properly refused to suppress evidence of the gun, holster and bullets. 261 A.2d at 883.[4] Thus, our Supreme Court has expressly recognized that deception does not invariably vitiate consent.

This Court, too, has retreated from the broad proscription in *Wright*, and has recognized that consent may be valid despite deception as to an officer's identity and/or motivation in obtaining a suspect's consensual relinquishment of privacy with respect to statements, contraband or other inculpatory facts or evidence.

Subsequent to our Supreme Court's decision in *Brown*, this Court stated in *Commonwealth v. Weimer*, 262 Pa.Super. 69, 396 A.2d 649 (1978), that, "stealth and strategy are necessary weapons in the arsenal of the police officer." We found in *Weimer* that consent to enter a private hunting club was not invalid despite the officers' deception as to their identities and their reasons for seeking entry. In *Commonwealth v. Poteete, supra*, this Court, citing *Wright* but not *Brown*, held that consent to enter the suspect's home was invalid when the officer deceived the suspect by letting the suspect think that the officer was there to follow-up on the suspect's stolen car report, when the officer was actually there to confirm his suspicion that

4. The Third Circuit Court of Appeals subsequently approved and supplemented the reasoning and authorities of the majority opinion in *Brown* in rejecting Brown's federal *habeas corpus* petition. *See Brown v. Brierly*, 438 F.2d 954 (3rd Cir.1971); *see also United States v. Stribling*, 437 F.2d 765 (6th Cir.1971) (demonstrating that the cases cited by the dissent in *Brown* were without precedential authority, in rejecting similar claims).

property lawfully observed on a prior visit was in fact recently stolen property.

However, two months later in *Commonwealth v. Morrison*, 275 Pa.Super. 454, 418 A.2d 1378 (1980), *cert. denied sub nom. Morrison v. Pennsylvania*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981), an *en banc* panel of this Court held that a landowner's consent to enter a barn in which large quantities of marijuana were suspected to have been stored was not rendered invalid by the officer's deception as to both his identity and his reason for wanting to see the barn. The *en banc* panel, without citing *Brown* or *Poteete*, expressly distinguished *Wright* as having been decided on the basis of federal precedent which had subsequently been substantially modified. 418 A.2d at 1381.

In *Commonwealth v. Schalszberger*, 285 Pa.Super. 586, 428 A.2d 200 (1981), consent to enter was deemed valid despite the fact that it was obtained by deception as to the officers' identity and reason for seeking entry, *i.e.* in order to facilitate the safe and effective execution of a lawful search warrant. In *Commonwealth v. Ginter*, 289 Pa.Super. 9, 432 A.2d 1024 (1981), consent to enter was deemed valid despite the officers' deception as to their identities and their reason for seeking entry, *i.e.* to confirm suspicions of liquor law violations. In *Commonwealth v. Markman*, 320 Pa.Super. 304, 467 A.2d 336 (1983), a panel of this Court stated unequivocally, "[c]onsent may be deemed voluntary even when procured by a police officer who misrepresents both his identity and purpose for making the search." As noted previously, this Court's decision in *Commonwealth v. Morgan*, which ignored *Morrison, Schalszberger,* and *Ginter* and instead relied on *Poteete,* was reversed by our Supreme Court. Finally, in *Commonwealth v. Carelli*, 377 Pa.Super. 117, 546 A.2d 1185 (1988), following a review of a majority of the foregoing cases, this Court held that neither *Wright* nor *Poteete* correctly stated the law regarding the effect of deception on consent as it is currently understood in Pennsylvania. I remain of that opinion.

In resurrecting *Poteete,* the majority herein offer three distinct justifications. I find each fatally flawed.

First, the majority attempts to distinguish *Carelli* based upon the presence in this case of a statutory duty on the part of the officers to state the purpose of their inspections. As explained above, I find that the statute requires no more than a statement of the type of authorized administrative inspection the officer intends or requests consent to conduct. Because the officer is not required *by statute* to disclose the reasons for seeking the inspection, this case is not distinguishable in that respect.

Second, the majority attempts to distinguish this case based upon their conclusion that the cases cited in *Carelli,* "were primarily cases involving undercover agents in fact situations uniquely suited to such police tactics; *e.g.* illegal narcotics dealings and illegal gambling operations." Majority Opinion, *supra,* 382 Pa.Superior Ct. at 311 n. 6, 556 A.2d at 1347 n. 6. While *Morgan, Ginter, Schalszberger, Morrison,* and *Weimer* arguably fit the restriction on the permissible use of deception which the majority suggests; *Albrecht, Brown,* and *Carelli* do not.

*Albrecht* involved uniformed officers investigating an arson case. *Brown* involved a uniformed officer investigating a murder case. *Carelli* involved a uniformed officer investigating a stolen truck case. Significantly, our Supreme Court explained in *Brown:*

The problem for this Court is to determine the permissible extent of police power in light of these United States Supreme Court decisions. *Lewis* (involving sales of marijuana to a federal narcotics agent), *Hoffa* (involving the planting of a government informer in defendant's hotel room to overhear conversations), and *Lopez* (involving an attempted bribe of an Internal Revenue agent) clearly do not require the police to be completely open and truthful as to their identity and purpose when dealing with suspects. They recognize that undercover work is an essential weapon in the police arsenal. *In this case the 'undercover' work was not as to Petrovich's identity as a*

*policeman but rather as to his motives in offering to sell the gun. It appears to us that there is no real difference between this deception and those found permissible in Lewis, Hoffa and Lopez.*

261 A.2d at 881–82. (Emphasis added). Thus, this case is not distinguishable from *Albrecht, Brown* or *Carelli* based upon the fact that the officers involved here were not working undercover, nor is this case distinguishable based upon the type of crime under investigation.

Third and finally, the majority suggests that because *Wright* has never been expressly overruled, *Poteete* and not *Carelli* correctly states the law with respect to the effect of deception upon consent in Pennsylvania. As explained in *Carelli*, however, *Wright* was decided by our Supreme Court based solely on federal law which was subsequently substantially modified. Moreover, subsequent decisions of our Supreme Court, while not overruling *Wright* expressly, have nonetheless expressly recognized this change in the law. *See Commonwealth v. Morgan, supra; Commonwealth v. Albrecht, supra; Commonwealth v. Brown, supra.* Thus, I remain of the opinion that *Wright* and *Poteete* no longer correctly state the controlling law, and that they were properly distinguished in *Morrison* and *Carelli.*

Of course, consent remains *invalid* if it is given in response to a false or invalid claim of authority. *See LoJi Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Go–Bart Importing Co. v. United States,* 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931).[5] Likewise, consent is *exceeded* when the scope of the search actually conducted is broader than that to which the individual has consented. *See Gouled v.*

---

**5.** Professor LaFave has suggested that, despite its broad *dictum, Commonwealth v. Wright, supra,* could reasonably be characterized as a "false claim of authority" case based upon the officer's statement to the wife that her husband had sent them to pick-up the evidence, thus, implicitly asserting that her husband had consented to the seizure of the evidence. III *LaFave, Search and Seizure* § 8.2(n), at 228 n. 273 (2d Ed.1987). Perhaps this explains why our Supreme Court has declined to overrule *Wright* expressly.

*United States, supra; Commonwealth v. Shaw,* 476 Pa. 543, 383 A.2d 496 (1978); *see generally* III *LaFave, Search and Seizure* § 8.1(c), at 160–174 & nn. 48–108.

Whether other types of deception vitiate consent must depend upon a case by case determination of the voluntariness of the consent in light of the totality of the circumstances, including the challenged deception. *See Commonwealth v. Brown, supra,* 261 A.2d at 882; *Commonwealth v. Morrison, supra,* 418 A.2d at 1380–81. The voluntariness of consent need only be established by a preponderance of the evidence. *Bourjaily v. United States,* 483 U.S. 171, 176, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144, 153 (1987); *United States v. Matlock, supra.* With the foregoing in mind, I turn to the facts of this case.

## 2.

Despite the officers' clear and uncontradicted testimony that Slaton was not the focus of the investigation when the challenged inspections were conducted on December 6, 1983 and December 7, 1983, the suppression court found that Slaton was in fact the focus of the investigation by December 6, 1983. The suppression court made its finding based upon the fact that numerous prescriptions seized in a prior, concededly lawful, consensual inspection of Slaton's prescription file had been confirmed as being fraudulent. The trial court rejected as not credible the officer's explanation that, though the forgeries and defects in the prescriptions were apparent to him as an experienced narcotics agent assigned to investigate such cases, the potential culpability of Slaton for *knowingly* filling fraudulent prescriptions did not receive the officers' focused attention until *after* numerous additional prescriptions were seized during the challenged inspections, and statements implicating Slaton were made by some of the suspects who pled guilty to having passed the fraudulent prescriptions. Even then, the officers did not process charges against Slaton until they received expert opinions from doctors and pharmacists that

·the defects in the seized prescriptions were such that they should have been questioned by Slaton.[6]

Nonetheless, the burden of proof was on the Commonwealth and it was within the province of the trial court to access the officer's credibility. Consequently, I reluctantly accept the trial court's finding that Slaton had become the focus of the investigation by December 6, 1983, despite grave reservations in this regard. *See Commonwealth v. Carelli, supra,* 377 Pa.Superior Ct. at 129 n. 1, 546 A.2d at 1191 n. 1.

The "deception" which the majority concludes is so implicitly coercive as to vitiate Slaton's consent is the deception implied from the fact that prior to the first lawful, consensual inspection of Slaton's prescription file the officers had indicated that they were investigating the possibility that a man named Merriweather and his accomplices had been passing fraudulent prescriptions, but that prior to the subsequent challenged inspections, the officers failed to inform Slaton that he had become the focus of their investigation. I find this "deception" to be inconsequential.

Slaton knew that the officers had seized numerous prescriptions as being potentially fraudulent during the previous lawful consensual inspection. He received a receipt for each of the prescriptions seized. As a licensed pharmacist he must be presumed to be aware of the fact that it would be a crime for him to *knowingly* fill fraudulent prescriptions. Consequently, when the officers returned and indicated that they wanted to conduct further inspections of his prescription file, is it not just as likely that Slaton was aware of his own potential liability without being informed of it by the officers, as it was for the officers to have focused their investigation on Slaton's potential culpability at that juncture? I think so.

Moreover, had Slaton been informed that he had become the focus of the investigation, is there any reasonable

6. I note that there is nothing in the suppression record to suggest that the prescriptions seized in the prior lawful inspection were viewed by the suppression court and deemed *obviously* fraudulent.

likelihood that he would then have withheld consent? I think not.

An "overwhelming percentage" of state administrative inspections of pharmacies are consensual. *See* Simonmeier, "Governmental Inspections of Pharmacies," *in* Strauss, *The Pharmacist and the Law*, at 14 (1980). Likewise, federal administrative inspections of pharmacies and drug manufacturing facilities are also overwhelmingly consensual. *See* O'Reilly, *Bad Actors Make Worse Law*, 37 Food Drug Cosmetic Law Journal 368, 371 (1982) (an estimated 99.5% of FDA inspections are consensual); Levitt, *FDA Inspections and Criminal Responsibility*, 36 Food Drug Cosmetic Law Journal 469, 473 n. 2 (1981) (though the FDA conducted approximately 33,000 inspections in 1978 and 1979, only about 25 inspection warrants were sought per year).

There are simple yet very good reasons why pharmacists almost invariably consent to administrative inspections. First and foremost, the vast majority of pharmacists are conscientious professionals who have nothing to hide, and who are as interested as law enforcement officers in preventing criminals from obtaining drugs illegally by passing fraudulent prescriptions in their pharmacies.[7] Second, refusal to grant consent may fuel nascent suspicions, while consent and cooperation, on the other hand, may be argued later in support of a defense that any irregularities discovered were innocent and inadvertent. *See* O'Reilly, *supra*, 37 Food Drug Cosmetic Law Journal at 370–71; Levitt, *supra*, 36 Food Drug Cosmetic Law Journal at 474–75; Davids, *supra*, 31 Food Drug Cosmetic Law Journal at 237; *cf. Commonwealth v. Carelli, supra*, 546 A.2d at 1197. Finally, an administrative warrant, if it is even needed (Parts III & IV, *supra* ), may be easily obtained by the officers. Thus, resistance to inspection would often be a futile and potentially harmful gesture.

7. With respect to FDA inspections, I note that in 1981 only 18 out of 36,258 administrative inspections resulted in prosecutions. *See* O'Reilly, *supra*, 37 Food Drug Cosmetic Law Journal at 371 n. 15.

Assuming, *arguendo*, that knowledge of the officers' suspicions would have outweighed the first possible motivation to consent, the second and third motivations would nonetheless apply. Based upon the fact that prescriptions lawfully seized previously had been confirmed as being fraudulent, there can be no doubt that an administrative warrant would have been issued authorizing further inspections of Slaton's prescription file had Slaton refused consent. What possible effect then could refusal have had but to fan suspicions and forfeit potentially favorable exculpatory evidence, *i.e.* that Slaton consented and cooperated freely because he at least *believed* he had nothing to hide? For this reason, I find the challenged deception inconsequential, and Slaton's consent fully voluntary.

## VI. APPROPRIATENESS OF SUPPRESSION

Assuming, *arguendo*, that the consent was invalid and the inspection was therefore unconstitutional, it does not follow that the prescription records must be suppressed. To the contrary, I find the suppression of the prescription records inappropriate in this case.

The exclusionary rule generally prohibits the use of physical or testimonial evidence derived as the direct and proximate result of unconstitutional conduct. *See Murray v. United States,* —— U.S. ——, ——, 108 S.Ct. 2529, 2532, 101 L.Ed.2d 472, 480 (1988). However, from its announcement in *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), and *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), to the present date, the exclusionary rule has remained a lightening rod for heated controversy. Though the United States Supreme Court has declined repeated invitations to abandon the exclusionary rule, it has acknowledged the high societal cost involved in the application of the rule, and has limited its application to cases where its general deterrent effects were perceived to outweigh its negative effects on the truth determining

process. *See Murray v. United States, supra,* —— U.S. at ——, 108 S.Ct. at 2532–36, 101 S.Ct. at 480–84; *California v. Greenwood, supra,* 486 U.S. at 35, 108 S.Ct. 1625, 1630–32, 100 L.Ed.2d 30, 39–40 (1988); *Illinois v. Krull,* 480 U.S. 340, 346–53, 107 S.Ct. 1160, 1165–69, 94 L.Ed.2d 364, 373–77 (1987); *Colorado v. Connelly,* 479 U.S. 157, 164–70, 107 S.Ct. 515, 520–24, 93 L.Ed.2d 473, 483–86 (1986); *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (*passim*), *reh. den.* 468 U.S. 1250, 105 S.Ct. 52, 82 L.Ed.2d 942 (1984); *United States v. Havens,* 446 U.S. 620, 624–28, 100 S.Ct. 1912, 1915–17, 64 L.Ed.2d 559, 564–66 (1980); *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) (*passim*); *Stone v. Powell,* 428 U.S. 465, 482–96, 96 S.Ct. 3037, 3046–53, 49 L.Ed.2d 1067, 1080–88 (1976); *United States v. Janis,* 428 U.S. 433, 443–60, 96 S.Ct. 3021, 3010–19, 49 L.Ed.2d 1046, 1054–64 (1976); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (*passim*).

Whether and to what extent there may be a state exclusionary rule in Pennsylvania arising from the Pennsylvania Constitution is uncertain in Pennsylvania. *See Commonwealth v. Montgomery,* 513 Pa. 138, 142–43, 518 A.2d 1197, 1199 (1986); *Commonwealth v. Shaeffer,* 370 Pa.Super. 179, 265–71, 536 A.2d 354, 398–400 (1988) (Kelly, J., concurring and dissenting). In *Commonwealth v. Morgan, supra,* our Supreme Court noted:

> [E]xclusion/suppression of evidence is not an appropriate remedy for every violation of the Pennsylvania Rules of Criminal Procedure concerning searches and seizures. It is only where the violation also implicates fundamental, constitutional concerns, is conducted in bad-faith or has substantially prejudiced the defendant that exclusion *may* be an appropriate remedy.

534 A.2d at 1056 n. 2, *quoting Commonwealth v. Mason,* 507 Pa. 396, 406–07, 490 A.2d 421, 426 (1985) (emphasis in original). In light of our Supreme Court's resolute resistance to the *federal* exclusionary rule prior to *Mapp v. Ohio,*

367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), I find that recognition and application of an independent state exclusionary rule by this Court would be inappropriate absent a clear command by our Supreme Court. *See Commonwealth v. Shaeffer, supra,* 370 Pa.Superior Ct. at 267–269, 536 A.2d at 399 (Kelly, J., concurring and dissenting) (discussing the prospect of a state constitutional exclusionary rule). I note that our Supreme Court has applied the *federal* exclusionary rule cautiously. In *Commonwealth v. Williams,* 454 Pa. 368, 312 A.2d 597 (1973), they explained:

> a prophylactic exclusionary rule is applied only in extreme cases where all other attempts to secure compliance have proven unsuccessful. *See generally Mapp v. Ohio,* 367 U.S. 643, 651–52, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In this area there has been no showing of widespread flagrant disregard to justify formulation of such a rule at this time.

454 Pa. at 372, 312 A.2d at 600; *see also Commonwealth v. Musi,* 486 Pa. 102, 115–16, 404 A.2d 378, 384 (1979).

The same may be said here. Even if we assume for the sake of argument that consent was rendered invalid by the officers' "deception," it nonetheless appears that the officers were acting on an objectively reasonable good faith belief that valid consent had been obtained. *Cf. Illinois v. Krull, supra; United States v. Leon, supra; Commonwealth v. Edmunds,* 373 Pa.Super. 384, 541 A.2d 368 (1988); *Commonwealth v. Shaeffer, supra,* 536 A.2d at 396 (Kelly, J., concurring and dissenting); *Commonwealth v. Morris,* 368 Pa.Super. 237, 533 A.2d 1042 (1987). There is certainly no indication of widespread flagrant disregard of suspects' rights in this manner so as to justify application of the concededly drastic sanction of exclusion.

Moreover, had the absence of valid consent been known to the officers, a valid administrative warrant could and would undoubtedly have been secured, and an unquestionably lawful inspection and lawful seizure of the prescription

records at issue would have been conducted. *Cf. United States v. Murray, supra; cf. Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The inevitableness of the discovery of such evidence, of course, need only be established by a preponderance of the evidence. *See Bourjaily v. United States, supra; Nix v. Williams, supra.*

Thus, under the facts of this case, both the "inevitable discovery" doctrine and the rationale of the "good faith" exception preclude suppression. *See United States v. Murray, supra; Illinois v. Krull, supra.*

## CONCLUSION

Based upon the foregoing, I concur in part and dissent in part. I agree that Slaton's appeal must be quashed. I find merit, however, in the Commonwealth's appeal. Slaton's consent to the inspection was valid, and even if it was not valid, suppression is inappropriate. I would reverse the portion of the suppression order directing the suppression of the prescription records seized on December 6, 1983 and December 7, 1983, and remand for further proceedings consistent with this concurring and dissenting opinion.

WIEAND, Judge, concurring and dissenting:

I concur in the decision of the majority to quash the cross-appeal filed by Louis Slaton. The contrary decision by a panel of the Superior Court in *Commonwealth v. Barnes,* 307 Pa.Super. 143, 452 A.2d 1355 (1982) is in conflict with prior Supreme Court decisions [1] and is properly overruled.

I respectfully dissent, however, from the majority's decision to affirm the trial court's order directing suppression of forged prescriptions removed from Slaton's files on December 6 and December 7, 1983. On those days, Slaton

---

1. See: *Commonwealth v. Fisher,* 422 Pa. 134, 221 A.2d 115 (1966); *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963).

expressly consented to searches of his files by agents of the Pennsylvania Bureau of Narcotics. This consent, according to all the evidence, was voluntary. It was neither forced nor induced by misrepresentation. On those occasions, Slaton delivered his files to the agents of the Bureau of Narcotics without asking and without being told the purpose or purposes of the search. Under these circumstances, his consent is not rendered involuntary merely because Slaton believed subjectively that the agents were looking for something different than they found. To the extent that the panel decision in *Commonwealth v. Poteete*, 274 Pa.Super. 490, 418 A.2d 513 (1980) suggests a contrary result, I would cause it to be overruled. Having voluntarily surrendered his records for examination by government agents, Slaton gave up any expectation of privacy with respect to such records and cannot complain that the narcotic agents found incriminating evidence therein. I would reverse the order suppressing evidence and remand for trial on all charges.

BECK, Judge, concurring and dissenting:

I agree with the majority that Slaton's cross-appeal must be quashed. A suppression court's denial or partial denial of a motion to suppress evidence is not appealable by the defendant *as a final order*. I would note, however, that under appropriate circumstances a defendant may seek an interlocutory appeal by permission from the denial or partial denial of a suppression motion. *See* 42 Pa.Cons.Stat. Ann. § 702(b) (Purdon 1981); Pa.R.App.P. 1311.

I dissent from that portion of the majority's opinion which holds that agents of the Drug Enforcement Administration violated the defendant's rights in December, 1983 when they removed forged prescription slips from his pharmacy. I do not agree that in order to conduct a valid consent search of a pharmacist's records, DEA agents must inform the pharmacist that he is the focus of an investigation.

The majority relies upon the statutory requirement that a drug enforcement officer state his purpose before conducting an inspection of a pharmacy. Pa.Stat.Ann. tit. 35, § 780–124(b)(2) (Purdon 1977). I agree with Judge Kelly that the DEA agents fully complied with this requirement when they notified Slaton that they wished to look through his records for evidence of forged prescriptions. *See* op. at 1357–1358 (Kelly, J., concurring and dissenting).

The majority also suggests that the consent search was constitutionally deficient since the DEA agents allowed Slaton to proceed under the false assumption that he was not suspected of criminal wrongdoing. In support of this conclusion, the majority cites *Commonwealth v. Wright,* 411 Pa. 81, 190 A.2d 709 (1963) and *Commonwealth v. Poteete,* 274 Pa.Super. 490, 418 A.2d 513 (1980). *Wright* and *Poteete* are distinguishable; those cases suppressed evidence where a uniformed police officer misled a home owner in order to to gain entry to a private residence. The instant case does not involve a search of a private home—an area that has traditionally received an especially high level of protection under the fourth amendment. Moreover, it is important to remember that the DEA agents did not lie to Slaton, or employ any elaborate ruse that was designed to mislead him. This case does not involve any significant misconduct by government agents. Slaton's sole complaint concerning the conduct of the agents is that they did not disclose that he was one of the targets of their investigation.

As former President Judge Spaeth has noted, "[t]he problem of defining the limits to be set on the use of police deception is one of the most difficult problems of the criminal law." *Commonwealth v. Morrison,* 275 Pa.Super. 454, 471, 418 A.2d 1378, 1386 (1980) (en banc) (Spaeth, J., concurring), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981). Each case must be carefully evaluated under the totality of the circumstances. In the instant case, I would conclude that the DEA agents acted properly and that Slaton's consent was valid. I respectfully dissent.