Earl T. Lanchester, Appellant, *v.* Pennsylvania State Horse Racing Commission, Appellee.

Argued June 3, 1974, before President Judge Bow-
MAN, and Judges CRUMLISH, JR., KRAMER, WILKINSON,
JR., MENCER, ROGERS and BLATT.

*Edward S. Finkelstein,* for appellant.

*James F. Cendoma,* General Counsel, with him *Robert J. Dixon,* Deputy Attorney General, for appellee.

OPINION BY JUDGE CRUMLISH, JR., September 26, 1974:

The Pennsylvania State Horse Racing Commission (Commission), after finding that Earl T. Lanchester (Appellant) had violated Commission Rule 15.09[1] by

---

[1] Section 15.09 of the Pennsylvania Rules of Racing provides as follows: "No person within the grounds of a Racing Association where race horses are lodged or kept while racing is in progress, shall have in or upon the premises which he occupies or controls, or has the right to occupy or control, or in his personal property or effects, any hypodermic syringes, hypodermic needles, or other devices, and any drugs which could be used for the injection or other infusion into a horse of a drug, stimulant or narcotic, or shall use appliances—electrical, mechanical, or otherwise—other than the ordinary equipment, of such nature as could affect the speed or racing condition of a horse. Every Racing Association, upon the grounds of which race horses are lodged or kept, is required to use all reasonable efforts to prevent the violation of this Rule. The Stewards, or any of them, or their designee, shall have the right to enter into, or upon the buildings, stables, rooms or other places within the grounds of such an Association, and to examine the same, and to inspect and examine the personal property and effects of any person, within such places; and every

having in his possession while on racing grounds hypodermic needles, drugs and other paraphernalia which could affect the performance of a race horse, suspended his trainer's license for twelve months.

The facts found by the Commission are not seriously disputed by Appellant, and therefore are binding upon this Court as supported by substantial evidence. *Johnson v. State Horse Racing Commission,* 5 Pa. Commonwealth Ct. 458, 290 A. 2d 277 (1972). However, a brief review is in order. At approximately 5:30 p.m. on October 2, 1973, three officials of the Commission searched, with Appellant's permission, the stable, tack and feed rooms occupied by Appellant at Penn National Turf Club in Grantville, Pennsylvania. Finding nothing, the officials asked permission to search Appellant's truck which was located on the racing grounds while a meet was in progress. Appellant declined unless a warrant was produced, whereupon the officials forced entry into the truck without a warrant, in reliance upon the consent to search which was executed by Appellant when he applied for a trainer's license as authorized by Rule 15.09. Concealed under a seat were various drugs and devices which could be applied to a race horse for nefarious purposes.

At the conclusion of a full hearing, the Board of Stewards issued a ruling suspending Appellant's license for a period of six months, commencing October 23, 1973. Appellant was further denied access to or the use of privileges at any race track within the Stewards' jurisdiction, and they ordered the removal and suspen-

---

person who is hereafter granted a license, does consent to such search, and to the seizure of any such hypodermic syringes, hypodermic needles or other devices, and any drugs, stimulants or narcotics, apparently intended to be or which could be, used in connection therewith, or any appliances—electrical, mechanical, or otherwise—other than the ordinary equipment, of such nature as could affect the speed or racing condition of a horse."

sion of all horses trained or owned by Appellant unless they were sold or transferred after approval by the Stewards. On October 26, 1973, Appellant appealed this determination to the Commission. A de novo hearing was conducted by the Commission, Chairman Joseph L. Lecce presiding, on November 14, 1973; and on November 19, 1973, this Court entered an order enjoining the Commission from enforcing the six month suspension pending the disposition of the appeal. On December 11, 1973, the Commission issued an adjudication and order signed by Chairman Lecce and Commissioner A. Marlyn Moyer, Jr., suspending Appellant's license for one year after finding a violation of Rule 15.09, and otherwise affirmed the Board of Stewards' ruling. This appeal followed.

Appellant in urging us to support his position contends initially that the full Commission did not consider his case, since only one Commissioner heard the testimony, and the final adjudication was signed by only two members of the Commission.

Section 20 of the Act of December 11, 1967, P. L. 707, *as amended,* 15 P.S. §2670 provides in part: "If the State Horse Racing Commission shall refuse to grant a license applied for under this act, or shall revoke or suspend such a license granted by it, the applicant or licensee may demand, within ten days after notice of the said act of the commission, a hearing before the commission and the commission shall give prompt notice of a time and place for such hearing at which the commission will hear such applicant or licensee in reference thereto. . . . *The commission may, if occasion shall require, by order, refer to one or more of its officers the duty of taking testimony in such matter, and to report thereon to the commission, but no determination shall be made therein except by the commission. . . ."* (Emphasis added.)

The statute does not require all the members of the Commission to be present during the entire adjudicatory process. Due process is satisfied if a hearing is held before one Commissioner, if other members subsequently review the testimony before the adjudication is made. *Fleming v. Commonwealth Civil Service Commission*, 13 Pa. Commonwealth Ct. 421, 319 A. 2d 185 (1974).[2] Hence Appellant's contention that he was not afforded due process is without merit.

The issue upon which this appeal must rise or fall, however, is whether the warrantless search of Appellant's motor vehicle on racing grounds by Commission officials or their designees is a violation of Appellant's right to be protected from unreasonable searches and seizures as guaranteed by the Fourth Amendment of our Federal Constitution. A determination of this issue necessarily turns on our resolution of two interrelated questions: (1) Was the Commission required to obtain a search warrant before searching Appellant's

---

[2] The Commission by adoption of Section A-21.14 of the Administrative Rules of Racing has set up the framework for rendering and issuing decisions by the Commission. Section A-21.14 reads: "Within 30 days after the conclusion of a hearing the Commission shall issue a written order. The Commission may also, in its discretion render a written adjudication including a statement of findings of fact and conclusions of law, with the reasons or basis therefor, upon all the material issues of fact, law or discretion presented on the record. All orders and adjudications shall be based upon a consideration of the whole record and be supported by reliable, probative, and substantial evidence. Any final order or adjudication must be signed and approved by 2 members of the Commission who shall have the right to enter such final order or adjudication based upon the record made at the hearing or hearings conducted by the Commission or its designated hearing officer, pursuant to the provisions of Section 13 hereof. Minority opinions may be submitted and these shall become part of the record."

This procedure was followed by the Commission in the instant case.

vehicle for suspected contraband?; and (2) assuming the former, did Appellant effectively waive his Fourth Amendment protection by consenting to a search?

The question of warrantless administrative or regulatory searches has been the subject of extensive judicial scrutiny in recent years. In *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523 (1967), the Supreme Court held that housing code enforcement administrative inspections by municipal health and safety officials constitute significant intrusions upon the interests protected by the Fourth Amendment, thus requiring the consent of the occupant or a warrant supported by the particular physical characteristics of the area to be searched. In the companion case of *See v. City of Seattle*, 387 U.S. 541 (1967), this requirement of a warrant or consent was extended to the administrative search of a business establishment going beyond the private dwelling concept. The Court, however, expressly reserved judgment on the question of warrantless regulatory searches incidental to licensing programs, indicating that they should be resolved "on a case-by-case basis under the general Fourth Amendment standard of reasonableness." *See, supra,* 387 U.S. at 546.

Guidance on this permissible utilization of warrantless regulatory searches came forthwith. In *Colonade Catering Corp. v. United States*, 397 U.S. 72 (1970), the Supreme Court was confronted with the statutory authorization of warrantless inspections of federally licensed alcoholic beverage dealers. Revenue agents, suspecting a violation of the federal excise tax law, visited the premises of a licensed dealer and asked to examine a locked storeroom. When the owner refused entry without a search warrant, the agents forced entry and confiscated contraband liquor. While concluding that Congress had the authority to authorize a warrantless search given the government's historically

broad power to regulate the liquor industry, the fruits of the search were suppressed as the statute did not specifically authorize a forcible entry, but limited the governmental remedy to a prosecution of the licensee for his refusal to permit an inspection.

This acceptance of warrantless regulatory searches became full-blown in *United States v. Biswell,* 406 U.S. 311 (1972), where the Court upheld a statutorily authorized warrantless search of a licensed gun dealer's locked storeroom. The respondent in *Biswell* initially resisted the search without a warrant, but when he was informed of the statutory authorization he consented to the search. In emphasizing that the question was not one of voluntariness, but whether the statute authorizing a non-forceable warrantless search violated the Fourth Amendment, the Court again examined the historical foundation for federal gun regulation, and, per Mr. Justice WHITE, concluded:

". . . if the law is to be properly enforced and inspection made effective, inspections without warrant must be deemed reasonable official conduct under the Fourth Amendment. In See v. City of Seattle (supra), the mission of the inspection system was to discover and correct violations of the building code, conditions that were relatively difficult to conceal or to correct in a short time. Periodic inspections sufficed, and inspection warrants could be required and privacy given a measure of protection with little if any threat to the effectiveness of the inspection system there at issue. . . . Here, if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate an inspection; and if necessary flexibility as to time, scope and frequency is to be preserved, the protection afforded by the warrant would be negligible.

"It is also plain that inspections for compliance with the Gun Control Act pose only limited threats to the dealer's justifiable expectations of privacy. When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection." 406 U.S. at 316.[3]

Applying these standards to the case before us, we must conclude that the warrantless search of Appellant's vehicle on racing grounds did not violate the Fourth Amendment. Although there is no statute specifically authorizing the search, Rule 15.09 of the Commission clearly falls within its power to "prescribe rules and regulations of *effectually preventing* the use of improper devices, the administration of drugs or stimulants or other improper acts for the purpose of affecting the speed of horses in races in which they are about to participate." Section 2(b)(2), Act of December 11, 1967, P. L. 707, 15 P.S. §2652(b)(2). (Emphasis supplied.) Much like the sale of liquor or firearms, horse racing in this Commonwealth is illegal outside of the limited geographic and chronologic sphere sanctioned by the Commission and regulation of horse racing and its incident gambling is deeply rooted in the police power of the Commonwealth. As this Court has said in the related field of harness racing: "(T)he sport, because of its very nature, offers an extraordinary opportunity for private individuals

---

[3] The last basis for Court's holding in *Biswell*—an implied consent by one entering a heavily regulated occupation to limitations on his "justifiable expectations of privacy"—was foreshadowed by the Pennsylvania Supreme Court in *State Real Estate Commission v. Roberts*, 441 Pa. 159, 271 A. 2d 246 (1970), holding that a broker who had refused inspection of his business records had waived his Fourth Amendment protection by entering the licensed practice of real estate brokerage.

to manipulate its operation to their own advantage." *Poisson v. State Harness Racing Commission,* 5 Pa. Commonwealth Ct. 20, 24, 287 A. 2d 852, 855 (1972). Recognizing the well-founded authority of the Commonwealth to regulate the field of horse racing, the remaining issue is whether the instant warrantless search infringed upon Appellant's "justifiable expectations of privacy." We think not. As in *United States v. Biswell, supra,* and *State Real Estate Commission v. Roberts, supra,* by entering and continuing in a heavily regulated endeavor Appellant was aware that he would be subjected to frequent and unannounced inspections. The potentiality for abusive searches is limited, and, given the obvious impossibility of *effectually* preventing the future use of illegal drugs and devices were a warrant required before a search, the governmental interest must prevail. The fact that the search here was forceable does not distinguish this case from the rationale of *Biswell* or *Colonade* because neither the regulation here nor its enabling legislation provide as an exclusive remedy a sanction for the refusal to permit a search.

An additional ground to sustain the search is Appellant's written consent to a search set forth in his application for a trainer's license. The application form provides in pertinent part immediately above the space for the applicant's signature: "By submitting this application the undersigned does hereby agree to abide by the Rules and Regulations of the State Horse Racing Commission . . . and does hereby *consent* to any provisions which may be contained in any of them for the search, within the grounds of a racing association, of any premises which I may occupy or control or have the right to occupy and of my personal property and effects, or the seizure of any article, the having of which, within such grounds may be forbidden." (Emphasis in original.) Where an individual entering a

traditionally regulated licensed field such as horse racing consents to a warrantless search of his person or premises directly related to or involved in that endeavor, his consent is held to constitute a waiver of his Fourth Amendment protections within the limits of valid regulation. *Zap v. United States,* 328 U.S. 624 (1945), *rev'd on other grounds,* 330 U.S. 800 (1947); *State Real Estate Commission v. Roberts, supra; Daley v. Berzanskis,* 47 Ill. 2d 395, 269 N.E. 2d 716, *cert. den.,* 402 U.S. 999 (1971).

Appellant's final contention is that the Commission was without authority to modify the six month suspension imposed by the Board of Stewards, or in the alternative, that the one year suspension was excessive and an abuse of the Commission's discretion. Under Sections 11 and 12 of the Act, 15 P.S. §§2661, 2662, the Commission is given the power to suspend or revoke trainer's licenses and to impose fines. Construing substantially similar provisions under the Act of December 22, 1959, P. L. 1978, §§9, 10, 15 P.S. §§2609, 2610, we held that the State Harness Racing Commission had the power to impose additional penalties or suspensions over those imposed by local racing judges. *Poisson v. State Harness Racing Commission, supra.* Given the similarity of the enabling legislation and the functional relationship of the Commission to the Stewards and the State Harness Racing Commission to local racing judges, we can only conclude that the Commission was within its authority in imposing the one year suspension in the instant case, and did not constitute an abuse of discretion.

Order affirmed.

---

CONCURRING OPINION BY JUDGE KRAMER:

Although I concur with the result of the majority opinion and the reasoning thereof, I feel constrained to

add some words concerning the authority of the Board of Stewards to suspend a license.

As I read the statute designated Thoroughbred Horse Race Meeting Corporations (hereinafter Act), Act of December 11, 1967, P. L. 707, *as amended,* 15 P.S. §2651 et seq., only the State Horse Racing Commission has the power and authority to issue, suspend and revoke the license in question. With specific reference to suspension, sections 11 and 12 of the Act, 15 P.S. §§2661 and 2662 set forth the Commission's power to suspend. There is no mention anywhere in the Act of the power to suspend being granted to the Board of Stewards. Section 10 of the Act, 15 P.S. §2660, states: "At all thoroughbred horse race meetings licensed by the State Horse Racing Commission in accordance with the provisions of this act, qualified stewards, judges and starters shall be approved by the commission. Such officials shall enforce the rules and regulations of the State Horse Racing Commission. . . ."

I have no reservation about the power of the Board of Stewards to investigate violations of the statute and of the Commission's rules and regulations. Neither do I doubt that the stewards, as a part of their law enforcement duties, may effectively prohibit a licensee from enjoying his rights and privileges at the racetrack for which they have been appointed. However, I can find no provision in the Act granting the stewards authority to suspend a license. Under this Act, only the granting authority, the Commission, can suspend. Certainly the Commission would not contend that the Board of Stewards has the authority to issue a license; and if that authority is absent in the stewards, then it legally follows that the stewards do not have the authority to suspend or revoke a license.

The record in this case indicates that the Board of Stewards initially suspended this licensee's license. This apparent defect in the procedure, however, was

not questioned by Lanchester, was never raised as an issue and, therefore, is not before this Court. In view of the fact that all of Lanchester's due process rights were protected, and the facts were properly determined by the Commission, the result is therefore correct from my point of view.