Felix E. PINERO, Petitioner,

v.

**PENNSYLVANIA STATE HORSE
RACING COMMISSION,**
Respondent.

Commonwealth Court of Pennsylvania.

Argued June 10, 2002.

Decided July 31, 2002.

Donald Bailey, Harrisburg, for petitioner.

Jorge M. Augusto, Harrisburg, for respondent.

Before COLINS, President Judge, PELLEGRINI, Judge, and JIULIANTE, Senior Judge.

OPINION BY Senior Judge JIULIANTE.

Felix E. Pinero petitions for review of the October 12, 2001 order of the Pennsylvania State Horse Racing Commission (PSHRC) that upheld its October 3, 2000 order and April 5, 2001 amended order imposing a five-year suspension of Pinero's jockey license on the basis that Pinero violated several PSHRC regulations.

Pinero contends: (1) that the PSHRC was barred by the principles of issue preclusion, *i.e.*, either res judicata or collateral estoppel, from suspending his license; (2) that the PSHRC's findings of fact are not supported by substantial evidence; (3) that his due process right to a fair and objective hearing was denied; and (4) that he was not properly advised or placed on notice of the requirement to report a suggestion of wrongdoing. For the reasons that follow, we affirm.

Pinero is duly licensed by the PSHRC as a jockey in Pennsylvania in accordance with Section 213(a) of the Race Horse Industry Reform Act (Act), Act of December 17, 1981, P.L. 435, *as amended*, 4 P.S. § 325.213(a). He has been a jockey for twelve years, licensed in Pennsylvania for nine years, and has ridden at Penn National Racecourse (Penn National) and Philadelphia Park.

On September 20, 2000, Pinero and eight other individuals were indicted by a federal grand jury and charged with bribery in sporting contests (18 U.S.C. § 224), including conspiracy to bribe and carry into effect a scheme to influence the outcome of numerous thoroughbred horse races at Penn National between January and May 2000. In particular, the indictment alleged that George Berryhill and Neil McElwee, joint owners of thoroughbred race horses, paid money to Ramon Pena, a jockey, in order for Pena and other jockeys to influence the outcome of races at Penn National. The scheme was to keep certain horses considered the favorites in certain races from finishing first, second or third. By keeping the favorites from finishing first, second or third, the payout on the winning exacta and trifecta wagers would be substantially greater.

With regard to Pinero, the indictment charged that he accepted $1,000 cash from Pena to influence Race No. 9 run at Penn National on May 6, 2000. During that race, Pinero rode a horse named "Big Hello," the odds-on favorite listed in the racing program. Big Hello finished last in that race.

The indictment also charged that Pena paid Pinero $1,000 to influence the outcome of Race No. 3 run at Penn National on May 7, 2000. During that race, Pinero rode a horse named "Pocket Picker," allegedly the best horse in the race. Pocket Picker finished the race in second place.

Eight of the nine individuals indicted pled guilty. Pinero, however, went to trial. On January 22, 2001, Pinero was found not guilty and acquitted on all charges.

Nevertheless, on October 3, 2000, the PSHRC temporarily suspended Pinero's license shortly after he was arrested on federal charges, pending further PSHRC action. On April 5, 2001, the PSHRC issued an amended order suspending Pinero's license for five years, effective from October 3, 2000 until October 5, 2005. In its order, the PSHRC determined that Pinero, in concert with other persons, attempted to fix and did in fact fix or otherwise influence Race No. 9 at Penn National on May 6, 2000 and Race No. 3 at Penn National on May 7, 2000.

Specifically, the PSHRC found that Pinero violated the following PSHRC regulations:[1] (a) 58 Pa.Code § 163.5 by failing to expend his best effort to win said races in which he participated and undertaking a course of conduct for other than the purpose of winning; (b) 58 Pa.Code § 163.173 by failing to faithfully fulfill his

---

**1.** The PSHRC's regulations set forth in 58 Pa.Code §§ 163.1–163.538, are also known as the PSHRC's "Rules of Racing."

engagements with respect to racing in said races; (c) 58 Pa.Code § 163.238(a) by failing to ride his horse out in said races, by intentionally causing his mount to lose ground where there was no reasonable cause for the loss of ground, and otherwise riding in a manner inconsistent with using the best efforts of the horse; and (d) 58 Pa.Code § 163.238(b) by failing to put forth every reasonable effort and exercise the greatest diligence in riding during those two races.

The PSHRC also found that Pinero violated 58 Pa.Code § 163.6(a) and 58 Pa. Code § 165.96(b) by failing to promptly notify or report to the PSHRC that he was approached by others to accept money to commit a fraudulent act in relation to racing or otherwise to affect the outcome of a horse race. In view of the foregoing, the PSHRC determined that Pinero's character, experience and general fitness was such that his participation in horse racing would be inconsistent with the public interest and the best interests of horse racing.

Pinero timely appealed from the PSHRC's order and on August 17, 2001, a hearing was held before the PSHRC's Hearing Examiner at which both the PSHRC and Pinero presented evidence. On October 12, 2001, the PSHRC issued its adjudication, wherein it determined that, as to Race No. 9 on May 6, 2000, Pinero did violate the PSHRC's Rules of Racing as set forth in the April 5, 2001 order. However, as to Race No. 3 on May 7, 2000, the PSHRC did not find sufficient evidence to support the allegations that Pinero violated the PSHRC's Rules of Racing as set forth in the April 5, 2001 order.

The PSHRC also determined that there was ample evidence to show that Pinero was aware of racing fixing activities and that he failed to promptly report that information to the PSHRC in violation of 58

Pa.Code §§ 163.6(a) and 163.96(b). As a result, the PSHRC concluded that Pinero's five-year suspension was warranted "by virtue of his failure to promptly report to the appropriate racing officials the attempted bribery of himself to alter the outcome of the races in which he participated...." PSHRC's Adjudication at 29.

■ Pinero appealed the PSHRC's order to this Court. Our review of the PSHRC's order is limited to determining whether the necessary findings of fact are supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. *Boyce v. State Horse Racing Commission,* 651 A.2d 656 (Pa.Cmwlth.1994). Questions of evidentiary weight and resolutions of evidentiary conflicts are for the PSHRC, not the reviewing court. *Id.*

## I.

■ Pinero's first argument is that the principle of collateral estoppel or "issue preclusion" applies in this case because the PSHRC did not conduct an additional investigation apart from the one it jointly conducted with the Federal Bureau of Investigation (FBI) and the Thoroughbred Racing Protection Bureau (TRPB). Therefore, Pinero contends that the federal jury verdict exonerating him of any wrongdoing is preclusive as to the PSHRC's administrative action against him. In support of his position, Pinero cites *Township of McCandless v. McCarthy,* 7 Pa.Cmwlth. 611, 300 A.2d 815 (1973), where the Court noted that where a question of fact has been litigated and determined by a final judgment, the determination is conclusive upon the parties in a subsequent action on a different cause of action.

■ In response, the PSHRC cites *Belote v. State Harness Racing Commis-*

*sion,* 688 A.2d 264 (Pa.Cmwlth.1997), where this Court recognized that a decision of the Maryland Racing Commission suspending an individual's harness racing license had no preclusive effect on the Pennsylvania State Harness Racing Commission's evaluation of that individual's application for a Pennsylvania harness racing license. In *Belote,* we noted that the

> four elements of collateral estoppel are: (1) the issue decided in the prior adjudication was identical to the one presented in a later adjudication; (2) there was a final judgment on the merits; (3) the party against whom the doctrine is asserted was a party to the prior adjudication or in privity with the party to the prior adjudication; and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue and question in the prior action.

*Id.* at 267. Furthermore, "[f]or a prior judgment to have res judicata effect on subsequent litigation, there must be (1) identity of issues, (2) identity of causes of action, (3) identity of persons and parties to the action, and (4) identity of quality or capacity of the parties suing or sued." *Id.*

In the present case, the PSHRC was neither a party in the federal trial nor in privity with any party in that action. Moreover, the criminal charges at issue in the federal trial were different from the administrative violations at issue before the PSHRC. As a result, we conclude that the results of Pinero's federal jury trial had no preclusive effect as to the administrative proceeding before the PSHRC. *Belote.*

■ In addition, in *Pennsylvania State Police v. Swaydis,* 504 Pa. 19, 470 A.2d 107 (1983), our Supreme Court recognized that "[i]t is well established that resolution of criminal charges in favor of a criminal defendant does not bar subsequent civil or administrative proceedings concerning the same underlying conduct." *Id.* at 22, 470 A.2d at 108. As a result, the fact that the criminal charges against Pinero were dismissed, does not, to any extent, preclude the PSHRC from determining that Pinero violated its regulations.

### II(a).

■ Pinero's second argument is that the PSHRC's adjudication is not supported by substantial evidence. In *Daly v. State Horse Racing Commission,* 38 Pa.Cmwlth. 77, 391 A.2d 1134, 1137 (1978), we defined substantial evidence as "such evidence as a reasonable mind might accept as adequate to support a conclusion." At the August 17, 2001 hearing, the PSHRC presented three witnesses: Gary Kanaskie, a special agent/investigator for the FBI in its Harrisburg office; Cesar Valdez, Director of Enforcement for both the State Harness Racing and Horse Racing Commissions; and Ramon Pena, a jockey convicted in the federal case and the individual alleged to have approached Pinero about participating in the scheme.

With regard to Race No. 9 on May 6, 2000, Valdez testified that Big Hello, ridden by Pinero, was the odds-on favorite to win. N.T. 143; R.R. 169a. Valdez then identified Penn National's program, which are filed with the PSHRC on a daily basis. *Id.* at 144, 199; R.R. 170a, 225a. The program reflects that Big Hello, ridden by Pinero, was its selection for Race No. 9. *See Id.,* Ex. C–7; R.R. (Vol.III) 528a–529a. However, as confirmed by Valdez and Pena, Big Hello finished last. *Id.* at 154, 270; R.R. 180a, 270a.

In addition, both Valdez and Pena testified that they reviewed the videotape of Race No. 9 and that immediately upon "breaking from the gate," Pinero pulled the horse against the rail. *Id.* at 150–151, 277–279; R.R. 176a–177a, 277a–279a. Val-

dez further testified that upon Big Hello's exit from the gate, his entire head was forcefully turned against the rail. *Id.* at 153–154; R.R. 179a–180a.

Further, Pena testified that the videotape showed that Pinero was holding and "cocking the horse sideways." *Id.* at 282–83; R.R. 282a–283a. Pena explained that Pinero was pulling the right reign only and that Big Hello's head was cocked to the inside. *Id.* at 283; R.R. 283a.

Pena also testified that the videotape showed that at the "head of the stretch," with a quarter-mile left, Big Hello was in last place and up against the rail. *Id.* at 284; R.R. 284a. Pena stated that Pinero was obviously only pretending to whip the horse and was actually just whipping the air. *Id.* at 284–285; R.R. 284a–285a.

In view of the foregoing evidence, this Court believes that there is adequate support in the record for the PSHRC's determination that as to Race No. 9 on May 6, 2000, Pinero (a) failed to expend his best efforts to win that race in violation of 58 Pa.Code § 163.5; (b) failed to ride out the horse, *i.e.,* Pinero intentionally caused his horse to lose ground and/or rode the horse in a manner inconsistent with using the best efforts of the horse in violation of 58 Pa.Code § 163.173; (c) failed to faithfully fulfill his engagement to racing with respect to that race in violation of 58 Pa. Code 163.238(a); and (d) failed to put forth every reasonable effort to win that race in violation of 58 Pa.Code § 163.238(b).

## II(b).

■ This Court also believes that there is substantial evidence to support the PSHRC's determination that Pinero failed to promptly report and/or notify the PSHRC that he was approached by others to commit a fraudulent act in relation to racing or to otherwise affect the outcome of a horse race in violation of 58 Pa Code § 163.6 and 58 Pa.Code § 165.96(b).[2] At the August 17, 2001 hearing, Pinero admitted that he did not report or notify the PSHRC about being approached by Pena to fix the May 6 7, 2000 races until the third time he was questioned about it by FBI Agent Kanaskie. N.T. 411–412; R.R. 408a–409a.

Kanaskie testified that on August 28, 2000, he spoke with Pinero at his home. *Id.* at 46–48; R.R. 75a–77a. At that time, Pinero denied knowing anything about race fixing. *Id.* On September 6, 2000, Kanaskie, Valdez and Don Ahrens from the TRPB met with Pinero. *Id.* at 48–50; R.R. 77a–79a. At this time, Pinero stated only that he had heard rumors about race fixing at Penn National. *Id.* Kanaskie testified that at that meeting, he specifically asked Pinero about the May 6–7, 2000 races. *Id.*

Kanaskie again interviewed Pinero on September 20, 2000 at which time Pinero was present to testify before the grand jury. *Id.* at 51; R.R. 80a. On this occasion, Pinero informed Kanaskie that Pena had approached him in the jockeys' room to take money as part of a race-fixing scheme. *Id.*

Based on this evidence, we conclude that there is adequate support in the record for the PSHRC's determination that Pinero violated: (a) 58 Pa.Code § 163.6(a) ("A person licensed by the Commission ... who is in possession of information regarding attempts or acts done in violation of this chapter or statute affecting racing,

---

**2.** This Court notes that in his "Questions Presented," Pinero also states: "4.) Did the Commissioner do any additional investigation as claimed in the Amended Order?" However, as discussed above, the PSHRC presented sufficient evidence at the August 17, 2001 hearing to support its determination that Pinero violated the PSHRC's regulations as alleged.

*shall promptly report the knowledge or information to the stewards, the Commission or its licensed security personnel. Failure to report may result in the imposition of disciplinary actions that the stewards or the Commission deems appropriate* "); and (b) 58 Pa.Code § 165.96(b) ("If a person under the jurisdiction of the Commission shall be approached with an offer, promise, request or a suggestion for a bribe or for an improper, corrupt or fraudulent act in relation to racing ... *it shall be the duty of the person to immediately report the matter to the Commission or one of its representatives.*") (Emphasis added.)

### II(c).

■ Pinero also claims that he was denied the opportunity to present exculpatory evidence in the nature of testimony from the federal trial that Big Hello was unhealthy on May 6, 2000. A review of the record indicates that the record was left open one week from the hearing, until August 24, 2001, for Pinero to submit additional evidence from the federal case. However, Pinero did not submit any additional evidence and the record was closed. *See* Hearing Examiner's August 29, 2001 letter; Certified Record (C.R.) 545a.

■ While subsequently returning the record to the Hearing Examiner, Pinero attempted to include a videotape marked "Defendant's Ex. 1." However, since this exhibit was not moved into evidence before the record was closed, the Hearing Examiner did not consider it. *See* Hearing Examiner's September 12, 2001 letter to counsel; C.R. 584a. Inasmuch as this exhibit was not moved into evidence before

the record was closed, this Court does not believe that the Hearing Examiner erred or abused his discretion in failing to consider it.

■ Pinero also contends that as a result of testimony in the federal case,[3] both Valdez and Kanaskie knew all along that Big Hello never ran another race after May 6, 2000 and that, therefore, Valdez's testimony that he did not remember that fact renders his entire testimony not credible.[4] However, as noted above matters of credibility, questions of evidentiary weight and resolution of evidentiary conflicts are within the sole province of the PSHRC. *Boyce.* Clearly, the PSHRC accepted the testimony of Valdez as credible. As such, this Court will not second-guess the PSHRC's credibility determination. *Id.*

### III.

■ Pinero's third argument is that his due process right to a fair and objective hearing was denied inasmuch as the Hearing Examiner admitted copies of Penn National racing programs for Race No. 9 on May 6, 2000 (Ex. C–7) and Race No. 3 on May 7, 2000 (Ex. C–8) without having them properly authenticated. This Court disagrees.

Upon cross-examination, Valdez testified that these exhibits were exact duplicates of the ones that were circulated to the patrons at Penn National. N.T. 186; R.R. 212a. Valdez further testified that he got them from an investigator at Penn National. *Id.* at 197; R.R. 223a. In view of this testimony, we do not believe that the Hearing Examiner erred in admitting Exhibits C–7 and C–8 into evidence. Moreover, as discussed above, matters of credi-

---

**3.** In his brief, Pinero cites to the testimony of Charles Albert DeMario in the federal case against Pinero. However, on March 21, 2002, this Court ordered that all references in

Pinero's brief to the transcript of the federal proceeding be stricken.

**4.** *See* Valdez's testimony at 211–212; R.R. 237a–237aa.

bility of the witnesses and evidentiary weight are for the Hearing Examiner, not this Court. *Boyce.*

 Pinero further contends that the Hearing Examiner violated his right to due process, as well as his Fourth Amendment right against unlawful searches and seizures, by not only disallowing a certain document into evidence, but also by making his counsel return it to the PSHRC's counsel. Pinero contends that the document was revealing "because it showed that no notations were made on records created by investigators during an interview with their star witness, Mr. Pena, about a race occurring, just a week or so before, that Mr. Pinero had allegedly fixed." Pinero's brief at 7–8.

The document contains the notation "May 6, 9th race, Pinero, $1,000." N.T. 363, R.R. 361a. Valdez testified that he acquired that document on May 19, 2000. *Id.* Apparently, this document shows that the PSHRC became aware of Pinero's possible involvement in the race-fixing scheme as of May 19, 2000.

However, Pinero offers no specific reason other than that "no notations were made on records created by investigators," as to why this document was material to the PSHRC's administrative proceeding and/or why the Hearing Examiner's decision not to admit it into evidence constitutes reversible error.[5] This Court does not believe that the actual date the authorities first became aware of Pinero's possible involvement in the scheme, whether in May or July of 2000, is essential to the PSHRC's determination that Pinero had violated its Rules of Racing. As a result,

we reject Pinero's contention that the Hearing Examiner's refusal to admit this document into evidence denied Pinero his right to a fair and impartial hearing.

Moreover, a review of the record indicates that the document belonged to PSHRC's counsel, who, out of courtesy, showed it to Pinero's counsel, who then refused to give it back. *See* N.T. 376–378; R.R. 374a–376a. Consequently, insomuch as the document was the property of PSHRC's counsel and not that of Pinero's counsel, this Court does not believe that the Hearing Examiner's taking possession of the document constituted an unlawful search or seizure as prohibited by the Fourth Amendment.

### IV.

 Pinero's fourth argument is that he was never properly advised as to the PSHRC's Rules of Racing. Initially, Pinero contends that not only does he not read English, but that the regulations he was found to have violated are not posted, published or displayed and that he was never taught about them. Pinero further contends that neither 58 Pa.Code § 163.6(a) or 58 Pa.Code § 165.96(b), which require a PSHRC licensee to promptly report to the PSHRC if he is approached to take money to be involved in a race-fixing scheme, are too vague in that they specify no time or time limit for reporting such conduct.

However, as the record reflects, Pinero testified that he did not notify the PSHRC about being approached by Pena because he was afraid. N.T. 411–412; R.R. 408a–409a.[6] In addition, Pinero concedes in his

---

5. Counsel for the PSHRC testified that he did not introduce the document into evidence because he did not think it was relevant. N.T. 377; R.R. 375a.

6. When asked why he didn't report being approached, Pinero testified regarding Tellie

Tamara, the trainer: "Well, he came to me, he told me he was the mob. He was one of the mob gangsters. Okay. He said some people, you know, from Puerto Rico. I'm from Puerto Rico. I know how the people are in Puerto Rico. And when he say that, you

brief: "Felix Pinero feared for himself and his family. It is indeed arguable that he may never have reported the approach Pena made...." Pinero's brief at 9.

In addition, 58 Pa.Code § 161.1 provides in pertinent part:

(a) Under the [A]ct the Commission will have the power to supervise generally thoroughbred horse race meetings in the Commonwealth at which parimutuel betting is conducted. The Commission is invested with the power to enact appropriate rules and regulations necessary to effectuate the purposes and provisions of the [A]ct and to prevent circumvention or evasion thereof.

. . . .

(c) *The rules shall also apply to a participant in or patron of a licensed meeting and each shall be charged with notice of and be conclusively bound by the provisions hereof.* The Commission may so amend or repeal these rules, in whole or in part. *Licensees, participants and patrons shall be similarly charged and bound by modifications.* Copies of the changes are available at the Commission office, at tracks or at the executive offices of the Commission in Harrisburg, Pennsylvania and will generally be published in the *Pennsylvania Bulletin.* (Emphasis added.)

In the case *sub judice*, Pinero has been a licensed jockey in the Commonwealth for nine years. As a licensed participant in thoroughbred racing in the Commonwealth, Pinero is charged with notice of the PSHRC's Rules of Racing. 58 Pa. Code § 161.1. Even upon repeated questioning by federal and state authorities as to his knowledge of a race-fixing scheme operating at Penn National, Pinero denied knowledge of any such scheme. As a re-

sult, this Court rejects Pinero's contention that he was unaware of his duty under the PSHRC's Rules of Racing to promptly report or notify the PSHRC that he was approached by Pena to take money to be involved in a race-fixing scheme at Penn National.

In view of the foregoing, the PSHRC's October 12, 2001 order upholding Pinero's suspension is affirmed.

### ORDER

AND NOW, this 31st day of July, 2002, the October 12, 2001 order of the Pennsylvania State Horse Racing Commission is hereby AFFIRMED.

know, I got scared.... These people—Sunday morning they can wait for me outside and do something to me. Do something to my family." N.T. 395; R.R. 392a.