IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Douglas Dietrich,                                    :
                              Petitioner            :
                                                     :
              v.                                     :
                                                     :
State Horse Racing Commission,          :          No. 156 C.D. 2022
                              Respondent   :          Submitted: August 8, 2025

BEFORE:    HONORABLE ANNE E. COVEY, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE STACY WALLACE, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON                          FILED: September 16, 2025


         Douglas Dietrich (Dietrich) petitions for review from the January 26,
2022, order of the State Horse Racing Commission (Commission). The Commission
affirmed the January 22, 2021, determination of the Board of Stewards of Penn
National Racecourse (Stewards) that Dietrich, an assistant starter[1] at the track,
violated Commission regulations during a January 20, 2021, incident when he
refused personal and vehicle searches by Commission personnel. The Commission
did, however, reduce the Stewards' penalty from revocation of Dietrich's track
license to a one-year suspension. Upon review, we affirm.


                    **I. Factual and Procedural Background**

         Dietrich has been in the military for over 20 years and is currently
active. Reproduced Record (R.R.) at 281a. He has worked around the track for

_____
         [1] An assistant starter "helps to corral the horses and jockeys into the starting gates before a
horse race begins." Comm'n Br. at 4 n.1.

decades and has been there part-time since 2019. *Id*. at 282a & 302a. He had not previously been subject to a search. *Id*. at 314a. Jason Klouser (Klouser) has been the Commission's director of enforcement since 2015. R.R. at 158a-59a. Cade Holden (Holden) has worked for the Commission as a special investigator since 2017 and was Penn National's acting track manager in January 2021; he still holds these jobs. R.R. at 38a & 100a. As of January 2021, Holden had conducted over 50 searches pursuant to Commission regulations, most of them at Penn National, for contraband, illegal drugs, doping agents, and devices used on horses. *Id*. at 39a. Such searches usually take place before races in the area around the starting gate and involve jockeys and starting gate staff. *Id*. at 40a-41a.

Holden stated that in January 2021, the Commission received an anonymous tip that a member of the starting staff was possibly passing on to jockeys a small hand-held battery-powered device that would "shock" horses into running faster during races. R.R. at 43a-44a. This was not only cheating, but could result in injuries to horses, jockeys, and other individuals in the track area. *Id*. at 104a. At about 5:30 p.m., shortly before the races were to begin, Holden and Klouser began a search at the "starter shack" near the track where jockeys and starting staff gather; according to Klouser, this is a secure and restricted area where only track personnel are permitted. *Id*. at 104a & 325a. Klouser explained what was going on, then the starters were sent outside to wait on one side of the shack with three state troopers present to observe and make sure no one left or tried to dispose of anything. *Id*. at 45a-46a. The starters were brought into the shack one by one, then Commission representatives, supervised by Klouser, began with a wand over the starters' clothing followed by a search of their jackets, vests, and pockets. *Id*. at 164a-65a. After the

2

personal searches, the starters were directed outside through another door for Holden to search their vehicles. *Id*. at 52a.

Holden stated that whenever he is out on the track grounds, he wears his Commission badge on a lanyard around his neck; he was wearing it over his winter coat at the time of the incident. R.R. at 41a-42a & 75a. He was also wearing a hat with the Commission's name on the front. *Id*. at 42a. Klouser also had his identification badge on at the time of the incident. *Id*. at 161a. Klouser believed he and Holden were reasonably identifiable as Commission representatives and that the lighting was sufficient to see their badges. *Id*. at 162a. Generally, Commission staff are around the track all the time and wearing their badges, so they would be known as authority figures. *Id*. at 177a.

Holden stated that during the process, a manager from another track who was assisting with the search told him that someone refused to be searched and was walking away. R.R. at 47a. The individual turned out to be Dietrich. Holden saw Dietrich walking towards the parking area, followed him, and called out to him about two or three times before he got his attention. *Id*. When Dietrich turned around, Holden recognized his face from seeing him around the track but did not know his name. *Id*. at 48a-49a.

Holden recalled Dietrich saying that he needed to go clock in, but Holden told Dietrich he could not leave in the middle of a search and had to go back to the shack area. R.R. at 50a. Holden gestured towards the shack and he and Dietrich walked towards that area. *Id*. at 51a. When they got there, Holden told Dietrich that someone would be with him shortly, advised the troopers that Dietrich had not been searched yet, and walked back to the parking area to resume car searches. *Id*. at 52a. Someone then told Holden that someone had refused to be

3

searched; he walked back to the shack area, where he saw Klouser explaining to Dietrich that if he refused the search, he would be escorted away. *Id*. Holden stated that Klouser asked him to get Dietrich's track license and make sure that he left the property. *Id*. at 53a. He and Dietrich walked to Dietrich's vehicle, where Dietrich got his track license; Holden photographed it and Dietrich drove away. *Id*. at 54a. Holden stated that their conversation was "cordial" and that Dietrich did not ask who he was, question his authority, or indicate that he did not understand what was happening. *Id*. at 54a & 105a.

Holden stated that he did not touch Dietrich or raise his voice other than to get Dietrich's attention at first. R.R. at 55a-56a. He did not see anyone else touch Dietrich. *Id*. at 61a-62a. It was "fairly dark" but there was residual light from the track in the shack area. *Id*. at 93a. He did not believe it was so dark that Dietrich would not have seen his identification outside of his winter coat or the Commission's name on his hat. *Id*. at 96a. Holden acknowledged that he was probably wearing a mask during the incident due to COVID-19 restrictions. *Id*. at 68a. He did not verbally identify himself to Dietrich as a Commission official because he assumed Dietrich had been in the shack when Klouser explained the search and its purpose; he did not know that Dietrich arrived on the scene after that had already occurred. *Id*. at 89a-92a. The search resulted in no contraband. *Id*. at 78a.

Klouser described the search area and process consistently with Holden's account. R.R. at 167a-68a. The area had residual lighting from the high-intensity track lights. *Id*. at 168a-69a. Klouser knew Dietrich from around the track, but not by name. *Id*. at 169a. Klouser supervised the personal searches and then went to help with vehicle searches for a period of time. *Id*. at 170a. As he was on his way back to the shack, one of the troopers and then a staffer told him that

4

someone did not want to be searched. *Id*. He went to the side of the shack where the starters were waiting before their searches and encountered Dietrich. *Id*. He told Dietrich that he heard Dietrich refused to be searched; Dietrich responded that he did not consent. *Id*. at 171a. Klouser explained that Dietrich's license entailed consent to these searches and that if he refused, he would be escorted off the property and subject to penalties up to revocation of his track license. *Id*. Dietrich said that he did not care and reiterated that he did not consent to be searched. *Id*. Klouser then told Holden to take Dietrich to his vehicle, get his license for proper identification, and make sure Dietrich left. *Id*. at 171a-72a. Dietrich did not ask Klouser who he was or why he had authority to perform the search. *Id*. at 172a. Klouser stated that the encounter was not an altercation and that he did not touch Dietrich or see anyone else touch him. *Id*. at 172a-73a. He estimated that 15 to 20 people in the shack area would have seen his encounter with Dietrich. *Id*. at 321a.

Klouser testified that the Commission does not keep written policies regarding how to perform these kinds of searches, but the Commission holds mandatory training every year. R.R. at 174a & 179a. The only time regulations require Commission personnel to identify themselves is for competition testing, which was not the case here. *Id*. at 177a. He did not verbally identify himself to Dietrich when they spoke during the incident but believes he was generally recognizable as a Commission representative. *Id*. at 177a-78a.

The Stewards held an emergency hearing on January 22, 2021, after which they revoked Dietrich's track employee license for violating Commission regulations authorizing searches by Commission personnel of track personnel on track premises, requiring licensees to consent to such searches as a condition of their licenses, and prohibiting licensees from engaging in conduct that violates

5

Commission rules and regulations. R.R. at 1a-2a (citing 7 Pa. Code §§ 181.18, 185.1(c) & 185.2). Dietrich filed a counseled appeal and received a stay of the revocation pending resolution of the appeal. *Id*. at 4a.

On August 25, 2021, a hearing examiner conducted a hearing. R.R. at 16a. Dietrich testified that he was late that evening and was headed to clock in when "some guy" grabbed him by the back of his jacket, accused him of trying to sneak away, and pushed him towards the shack area. *Id*. at 284a-85a. He did not know what was going on because he missed the search instructions. *Id*. at 286a. He felt disrespected and told the man to take his hands off him. *Id*. It was dark, the man had no identification, and he did not know who it was at the time. *Id*. at 285a-86a. He later learned it was Holden, whom he did not know and had never seen before, although he subsequently acknowledged that he had seen Holden around the track before. *Id*. at 286a & 303a. He was unhappy about getting pushed around and decided to leave when Holden grabbed him again and shoved him towards the shack. *Id*. at 286a-87a. Another man, who appears to have been Klouser, came up and said he was going to search him, but Dietrich refused and said he was leaving. *Id*. at 287a. Holden then asked for his license; they walked back to Dietrich's truck and he refused a vehicle search. *Id*. at 288a. Holden took a picture of the license and Dietrich left. *Id*.

Dietrich maintained that Holden assaulted him and that he rightfully refused to be searched by "a bunch of thugs" acting unprofessionally. R.R. at 291a & 295a. He stated that if Holden and Klouser had been "professional," he would have agreed to be searched. *Id*. at 304a. He agreed that Commission personnel had the right and authority to conduct these searches but maintained that what happened

6

was wrong because Holden and Klouser did not identify themselves and were acting like thugs. *Id*. at 305a-06a.

Dietrich called four witnesses who were starters, one jockey, and the track veterinarian, all of whom personally knew from being around the track that Holden and Klouser were with the Commission; several acknowledged that this was common knowledge among track personnel. *Id*. at 202a-04a, 211a-12a, 218a, 230a, 239a-43a & 274a. Dietrich's witnesses either did not see the incident or denied seeing either Holden or Klouser touch Dietrich except for Gary Boyer, a track maintenance worker and heavy equipment operator who testified remotely over the objection of counsel for the Commission. *Id*. at 247a-48a. Boyer stated that he saw the incident from about five feet away. R.R. at 253a & 256a. From his view, "one or two" "random guys" put their hands on Dietrich and shoved him from the parking area about 10 feet towards the shack area. *Id*. at 253a-55a & 259a. He stated they did not have identification badges on. *Id*. at 254a. He does not know Holden or Klouser, as his work does not involve enforcement issues. *Id*. at 258a-59a. He acknowledged, however, that he knew during the incident that Commission people were probably conducting the search. *Id*. at 263a & 265a-66a.

On January 26, 2022, the Commission issued its decision and order affirming the Stewards' determination. R.R. at 360a-73a. The Commission did not find Dietrich credible and did not specifically comment on the credibility of his witnesses. *Id*. at 371a. The Commission acknowledged that Dietrich was not present for the pre-search announcement but credited Holden and Klouser's testimony that they were visibly wearing their badges and told Dietrich that a search was in progress. *Id*. The Commission concluded that Dietrich refused the search because he did not like Holden's and Klouser's conduct and not because he did not know

7

they were acting on the Commission's behalf.  *Id*.  To the Commission, Dietrich's "unsubstantiated reasons for his refusal to be searched by Commission investigators do not justify his refusal."  *Id*.  Because Dietrich refused to be searched, the Commission determined that he violated the relevant regulations; however, due to his lack of previous disciplinary violations, his license revocation was reduced to a one-year suspension.  *Id*. at 372a.  Dietrich timely petitioned for review to this Court.

## II. Issues and Arguments

Dietrich argues that Holden and Klouser did not tell him they were with the Commission and there was no finding of fact that he saw their identification badges during the incident.  Therefore, he could not have knowingly refused a search by Commission officials.  Dietrich Br. at 9-10.  Dietrich maintains that the relevant regulation does not entail "strict liability" such that his knowledge of Holden's and Klouser's Commission roles was irrelevant, so imposing punishment on him for a violation he did not knowingly commit violates due process principles.  *Id*. at 11-12.

The Commission responds that Dietrich essentially challenges the sufficiency of the Commission's evidence, which clearly establishes that Dietrich more likely than not knew Holden and Klouser worked for the Commission at the time of the incident and knowingly refused to be searched.  *Id*. at 14-20 & 22-24. The Commission asserts that Dietrich's due process arguments are waived because he did not raise them before the Commission or in his petition for review to this Court.  *Id*. at 21-22.[2]  The Commission states that horse racing is a highly regulated

---

[2] Additionally, the Commission argues that Dietrich's appeal is moot because his one-year suspension concluded in January 2023 during this Court's briefing period.  Comm'n Br. at 27-31. The Commission also made this argument in a parallel application to dismiss filed with this Court. That application was denied in a single-judge memorandum opinion.  *Dietrich v. State Horse*

activity, that its regulations are in place to maintain integrity, which serves the public interest, and that it was not required by due process to prove whether Dietrich knowingly refused the search to establish that he violated the relevant regulations. *Id*. at 25-26.

## III. Discussion

Section 181.18 of the Commission's regulations states:[3]

> To . . . effectively prevent the use of improper racing devices, . . . maintain proper and adequate supervision of racing and enforce the laws of the Commonwealth, the Commission or its representatives, shall have the right and privilege to conduct a search within the areas of the track premises which any owner, trainer, driver, groom, vendor of racing equipment and service or other licensee acting in their behalf, may occupy and to control including all personal property and effects . . . .

7 Pa. Code § 181.18. Section 181.1(c) states:

> By acceptance of a license, a licensee consents to search and inspection by the Commission or its agents of the licensee's person, personal property and areas under the licensee's possession, care or control. The licensee explicitly consents to the seizure of any prohibited medication, drugs, paraphernalia or other illegal devices

---

*Racing Comm'n* (Pa. Cmwlth., No. 156 C.D. 2022, filed Apr. 5, 2023) (unreported) (concluding that in the event Dietrich's suspension is reversed, it would be cleared from his record, which has "ongoing significance to his ability to hold a track employee license"). *Id*. at 5.

[3] Our review of Commission orders is limited to determining whether findings of fact are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. *Pinero v. Pa. State Horse Racing Comm'n*, 804 A.2d 131, 135 (Pa. Cmwlth. 2002). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 136.

or contraband in accordance with State and Federal law and with the applicable provisions of the act.[4]

7 Pa. Code § 185.1(c).  Section 185.2 states:

A licensee shall not, alone or in concert with another person, engage in inappropriate, illegal or unethical conduct which violates the Commission's rules and regulations of racing, is inconsistent with the best interests and integrity of racing or otherwise undermines the general public's faith, public perception and confidence in the racing industry.

7 Pa. Code § 185.2.  The Commission's regulations governing searches of track personnel and licensees do not violate Fourth Amendment search and seizure protections and rest on the validity of the regulations in this highly regulated field as well as the licensees' consent.  *See Lanchester v. Pa. State Horse Racing Comm'n*, 325 A.2d 648, 653 (Pa. Cmwlth. 1974).  In this context, questions of evidentiary weight and resolutions of evidentiary conflicts are for the Commission, not the reviewing court.  *Pinero v. Pa. State Horse Racing Comm'n*, 804 A.2d 131, 135 (Pa. Cmwlth. 2002).

Here, Dietrich's assertion that he did not knowingly refuse the search because Holden and Klouser did not identify themselves as Commission personnel and he was not aware that the search was under the Commission's auspices is belied by substantial record evidence.  Holden and Klouser acknowledged that they did not verbally identify themselves to Dietrich, but Dietrich does not dispute Klouser's statement that the only time verbal identification is required is for competition testing, which is not at issue here.  R.R. at 89a-92a, 177a-78a.  Both testified that they wore their Commission badges during the incident, and this was not refuted by any of Dietrich's witnesses except Boyer, whose remote testimony was described by

---

[4] The Race Horse Industry Reform Act, 3 Pa.C.S. §§ 9301-9374.

10

the hearing officer as bearing "inherent limitations" in terms of credibility evaluation. *Id*. at 250a. Moreover, Boyer acknowledged that during the incident, he "was pretty aware" that "it was probably the Commission" conducting the search. *Id*. at 266a.

Other than Boyer, whose maintenance and equipment job at the track does not entail interaction with the horses and jockeys or activities that would regularly involve the Commission, all of Dietrich's witnesses acknowledged that they personally knew Holden and Klouser and knew that they were with the Commission; several acknowledged that this was common knowledge among track personnel. *Id*. at 202a-04a, 211a-12a, 218a, 230a, 239a-43a & 274a. It was dark at the time, but other than Dietrich, all witnesses generally agreed that there was residual lighting from the track in the area and Dr. Pack, the track veterinarian, acknowledged that he would have recognized Klouser if he saw him outside with Dietrich during the incident. *Id*. at 244a. Moreover, Klouser testified that the area where the incident occurred was secure and restricted to track personnel. *Id*. at 325a. This evidence, taken as a whole, supports the Commission's ultimate rejection of Dietrich's position that he did not know or realize that a Commission search was in progress during the incident.

Dietrich's own testimony was inconsistent. He initially testified that Holden was not wearing his badge and that he did not know Holden and had never seen him before. R.R. at 285a-86a. He later acknowledged, however, that he had seen Holden around the track. *Id*. at 303a. Dietrich also undermined his assertion that he did not know Holden and Klouser were with the Commission when he stated that if they had been "professional" towards him, he would have agreed to be searched and that he understood such searches were permitted. *Id*. at 304a-06a.

11

Given the consistency of Dietrich's own witnesses' testimony that they knew Holden's and Klouser's identities and roles with the Commission, along with Holden's testimony that he was the acting track manager at the time of the incident, this record contains substantial evidence that even assuming Dietrich did not initially know what was going on, based on his decades of experience and familiarity with the track, the individuals involved directly with the horses and races, and his knowledge that searches were permitted, he would quickly have realized that it was a Commission search to which he had consented as a condition of his license.

In rejecting Dietrich's credibility and arguments, the Commission stated that Dietrich "was explicitly told by a Commission investigator wearing his badge that [Dietrich] was to be searched." R.R. at 371a. Further, the Commission rejected Dietrich's position that Holden's and Klouser's alleged conduct during the incident was a valid basis to refuse the search, concluding that Dietrich's "unsubstantiated reasons for his refusal to be searched by Commission investigators do not justify his refusal." *Id*. Among those reasons rejected by the Commission was Dietrich's argument that he did not know Holden and Klouser were with the Commission and conducting a search permitted by the regulations. Accordingly, we cannot accept Dietrich's argument that the Commission's failure to expressly find that he did know their identity and purpose was fatally flawed.

Section 181.18 authorizes Commission personnel to search any individual or area on the track premises for "improper racing devices" like the battery-powered "shocker" mentioned in the anonymous tip received by the Commission. Section 181.1(c) states that a condition of track licenses, like the one Dietrich holds, is consent to Commission searches for "illegal devices or contraband." 7 Pa. Code § 185.1(c). Section 185.2 bars licensees from any conduct

12

that "violates the Commission's rules and regulations." 7 Pa. Code § 185.2. As such, the Commission's determination that Dietrich's testimony, including his assertions that he did not know Holden and Klouser, was not credible and that he refused a valid and authorized Commission search in violation of the relevant regulations was supported by the record and not in error.[5] *Pinero*, 804 A.2d at 135.

## IV. Conclusion

In light of the foregoing, the Commission's January 26, 2022, order imposing a one-year suspension of Dietrich's track employee license for violations of Commission regulations is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

---

[5] We agree with the Commission that Dietrich waived his due process issue because it was not raised in his written appeal to the Commission from the Stewards' determination or during the Commission hearing at which both sides waived briefing in lieu of closing arguments. *See* R.R. at 3a & 16a-334a; *see also Lehman v. Pa. State Police*, 839 A.2d 265, 276 (Pa. 2003) (stating that claims "challenging a statute's application to the facts of a particular case must be raised before the agency or are waived"). Even if Dietrich had not waived this issue, because he failed to establish that his refusal to consent to the search was based on lack of knowledge of the circumstances, his due process argument that he cannot be punished for an act that he did not know violated the regulations is meritless, and the Commission's determination did not violate constitutional principles. *See Pinero*, 804 A.2d at 135.

13

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Douglas Dietrich,            :
           Petitioner      :
           :
        v.            :
           :
State Horse Racing Commission,    :    No. 156 C.D. 2022
           Respondent    :

# **O R D E R**

AND NOW, this 16th day of September, 2025, the January 26, 2022, order of the State Horse Racing Commission is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge